**RECONSTRUCTION FINANCE CORPORATION, a corporation, Appellant,**

v.

**SULLIVAN MINING COMPANY, a corporation, Appellee.**

**No. 14755.**

United States Court of Appeals
Ninth Circuit.

March 5, 1956.

**248**

Stimson & Donahue, L. Vincent Donahue, Spokane, Wash., Tom B. Paine, Wallace, Idaho, for appellant.

tiorari denied 339 U.S. 964, 70 S.Ct. 998, 94 L.Ed. 1373; United States v. Holly,

Charles E. Horning, Wallace, Idaho, Robert E. Brown, Kellogg, Idaho, for appellee.

Before STEPHENS, HEALY, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is an appeal from a judgment in the sum of fifty-four thousand odd dollars awarded Sullivan Mining Company for its out-of-pocket costs in stockpiling zinc concentrates for the government during and following the Second World War.

It is not disputed that Sullivan incurred costs in the amount awarded. The question is whether in the contingency which developed during the course of the relationship Sullivan became entitled to recover its costs. Resolution of the controversy turns on the interpretation to be given certain writings expressive of the understanding between the parties, plus consideration of background conditions and informal interchanges.

Sullivan owned and operated a zinc smelter near Kellogg, Idaho, in which concentrates obtained from a mine of its own as well as concentrates purchased from other mines were processed. Shortly after the entry of the United States into the war a program was officially promulgated having as its object the expansion of the output of copper, lead and zinc by domestic mine operators through the payment of premium prices therefor under a quota system. The program was placed in charge of Metals Reserve Company, a governmental corporation created under the Reconstruction Finance Corporation Act, 15 U.S.C.A. § 601 et seq. In February of 1942 Metals Reserve wrote Sullivan explaining the plan and requesting Sullivan to act as an agent of Metals Reserve in the administration of the program. Upon Sullivan's acceptance, Metals, in June following, forwarded a "Letter Agreement," which was accepted and executed by Sullivan as of June 18, 1942.

10 Cir., 192 F.2d 221; and O'Toole v. United States, 3 Cir., 206 F.2d 912.

Three provisions of this Letter Agreement are germane here. The first of these is the following paragraph:

"We understand that, due to the recent increase in production of zinc concentrates in your district, your existing smelter capacity is inadequate to treat the quantities of material being tendered to you; that you now have on hand your normal emergency reserve of material and do not feel warranted in purchasing for your own account for reserve, any additional material. In order to encourage the continued production of this material in your district, deemed necessary in the war effort, this Company will purchase an amount of this material, for a period of time, tendered to you in excess of your smelting capacity as hereinafter stated."

The second is a sentence reading:

"You will stockpile, at your expense, such material so purchased on the property of your smelter at Silver King, Idaho, * * *."

The third provision of consequence reads:

"We understand that you desire the material purchased hereunder for our account to be sold to you from time to time as you are able to treat same. In such connection, you will advise us in writing of the quantity and quality of material desired and the date when same will be needed."

The last-quoted passage appears in a lengthy paragraph setting out in detail the method by which the value of the concentrates and the amounts to be paid for them by Sullivan were to be determined.

In 1944 Metals Reserve prepared an amendment to the original contract, giving to itself the right to remove from the stockpiles and ship to other smelters for treatment all or any part of the concentrates purchased and stockpiled by Sullivan for the account of Metals Reserve. This instrument was mailed to Sullivan under date of July 12, 1944, and was shortly confirmed or agreed to by the latter without change. A provision of this amendment reads:

"If this Company [Metals Reserve] should for any reason remove material from stockpile for any purpose other than for sale to you, you will be reimbursed for actual out-of-pocket expense incurred in connection therewith upon receipt from you of your signed statement reflecting the nature of each item of expense or cost and summarizing the work performed to which the charges apply (i.e. the tonnage removed, weighed and handled)."

At this juncture the ensuing course of events, as related in the undisputed findings of the trial court, will be summarized briefly. In 1945 Metals Reserve, by virtue of an act of Congress, ceased to exist. Along with a number of other war-born corporations its functions, powers and assets were transferred to Reconstruction Finance Corporation, appellant here. The latter, pursuant to an amendment, thereupon became a party to the contracts with Sullivan in place and stead of Metals Reserve.

The duration of the government's stockpiling program was extended from time to time and finally terminated on June 30, 1947, after which date there was no further stockpiling of concentrates on its behalf. Sullivan had been authorized to stockpile 80,000 tons of the material and actually did stockpile 72,-263.64 tons, expending of its own funds the sum of $54,864.10 in the construction and maintenance of the storage bins in which the concentrates were placed and in weighing and unloading the concentrates into the bins as the same were delivered to Sullivan by the various shippers. No portion of the concentrates so stockpiled was ever withdrawn for processing by Sullivan.

It was not until February of 1948 that the government indicated to Sullivan its intention to ship any of the accumulated concentrates to other smelters for processing. Between that date and the

end of 1948 the RFC removed from the stockpile and shipped elsewhere for processing 19,224 tons of concentrates. In 1949 Sullivan completed at a cost of $2,500,000 an extensive enlargement of its smelting plant, thus providing sufficient capacity to enable it to process the government's concentrates, amounting to some 48,000 tons, then remaining in its stockpiles. Sullivan offered to purchase these concentrates but its offer was not accepted and the concentrates were removed by the government and shipped and sold to other smelters.

The trial court determined that by the contract of June 1942 it was the understanding of both parties that in consideration of Sullivan's stockpiling of the concentrates at its own expense it was to have the right to repurchase them and to process and market the result, thus deriving a profit as it did in the case of its usual custom smelting operations. It further determined that by the provision of the amendment of July 12, 1944, heretofore quoted, it was the understanding and intent both of Sullivan and of Metals Reserve that Sullivan was to be reimbursed for all stockpiling expense incurred in connection with any and all concentrates which might be removed by Metals Reserve and shipped to other smelters for treatment; but that Sullivan was to continue to bear the expense of the stockpiling of concentrates which should thereafter be purchased and processed by itself.

■ We are satisfied that the court's construction of the agreement is warranted both by the language of the amendment and by the facts and circumstances in evidence. But the government in effect contends that the crucial clause of the 1944 amendment does not mean what it appears to say. Government counsel argue that it was the intention of the parties that Metals Reserve was to reimburse Sullivan for its expense only in connection with *the removal* of the material for sale to others, and that it was not the intention in such circumstances to reimburse Sullivan for its expense in establishing and maintaining the stockpile. If such had been the intention it would have been a simple matter for Metals Reserve to make it plain that the reimbursement of Sullivan was to be limited to the mere cost of removal. The 1944 agreement was written in its entirety by Metals Reserve, not by Sullivan, and its language, where ambiguous, is to be construed strongly against the author. See Restatement, Contracts, § 236(d): "Where words or other manifestations of intention bear more than one reasonable meaning an interpretation is preferred which operates more strongly against the party from whom they proceed, unless their use by him is prescribed by law." We may add that there is evidence in the record indicating that the government's present construction of its contract is no more than an afterthought.

■ The government advances the further argument that Sullivan's participation in the stockpiling program was based upon expectations of profits it would enjoy from full production in the Coeur d'Alene mining area, high metal prices, etc. Very likely considerations of this nature did enter into the picture; but the function the courts are called upon to perform in this lawsuit is to construe and give effect to the arm's length arrangement the parties were content to make.

■ One other matter remains to be noticed. In October of 1948 appellant (Reconstruction Finance) advised Sullivan by letter that it was turning the physical custody of the remaining stockpiled concentrates over to the Bureau of Federal Supply, an arm of the Treasury Department. On or about November 30, 1948, Reconstruction Finance executed what purported to be an assignment of its contract with Sullivan to the Bureau of Federal Supply. This writing contained a provision to the effect that the assignment "shall be and is conditioned upon Assignee's assuming all duties and obligations of Assignor under said agreement, as amended." The trial court held as a matter of law that as between Sullivan and Reconstruction Finance the

purported assignment was ineffective except as a transfer of the physical custody of the remaining concentrates to the Bureau of Federal Supply, this by reason of the fact that the condition of the assignment was never fulfilled. Appellant complains of this conclusion, contending that it may be held liable only for Sullivan's costs in respect of the concentrates sold and shipped prior to the assignment.

We think the court's ruling was not error. Throughout this entire transaction the government of the United States was the real party in interest. Its program was carried on through a succession of governmental corporations or bureaus, and was financed entirely out of the Federal treasury. The argument of Reconstruction Finance in this connection is predicated on fictions and technicalities and is wholly without substance.

Affirmed.

POPE, Circuit Judge (concurring).

I concur in the foregoing opinion and should like to add some observations of my own. The language quoted from the July 12, 1944 amendment to the contract between the parties may be susceptible of two constructions. But certainly it is a permissible construction that the words "will be reimbursed for actual out-of-pocket expense incurred in connection therewith" refers to all expenses incurred in connection with the stockpiling.

This construction, which the trial court adopted, appears to me to be the more reasonable one. For obvious reasons the language should be construed most strictly against Metals Reserve which drew the instrument. It is unreasonable to suppose that Sullivan would have agreed to the stockpiling arrangement if it had not contemplated a chance to get its expenses back by processing the concentrates itself. It is difficult to understand how it would agree to a modification of the arrangement which would result in its losing all these costs. The correspondence in evidence indicates that as late as June 23, 1949, the Bureau of Federal Supply did not dispute Sullivan's contentions as to the meaning of this language as embracing reimbursement for both "inbound" and "outbound" costs, indicating that the only question was whether Reconstruction Finance or the Bureau should pay such charges for material shipped prior to December 1, 1948. Clearly the present contention of Reconstruction Finance is an afterthought.

With respect to the claim that Sullivan had agreed in advance in the original stockpiling contract that its claims against Metals Reserve (and Reconstruction Finance) should cease upon the latter's assignment to any other branch or agency of the Government, it is plain that that provision for release of the original obligor cannot serve the appellant here for the provision was a conditional one. It was expressly "conditioned upon such assignee's assuming all duties and obligations of Metals Reserve hereunder". After Reconstruction Finance notified Sullivan that it was going to transfer and assign, it did in fact execute a written assignment to the Bureau of Federal Supply, which is exhibit 22 in evidence. That also contained the same condition respecting the assignee's assuming all duties and obligations of the assignor. But the Bureau never did so. On August 9, 1949, it wrote Sullivan expressly disclaiming all liability for the charges about which Sullivan had been writing and upon which it was insisting; charges, which, as we here hold, were perfectly valid ones. Since the express condition for the appellant's release was never fulfilled, the release was never accomplished.