**CALIFORNIA COMPANY, Appellant,**
v.
**Stewart L. UDALL, Secretary of the Interior, Appellee.**

**No. 16132.**

United States Court of Appeals
District of Columbia Circuit.

Argued April 14, 1961.
Decided Aug. 10, 1961.

---

8. 64 Stat. 1129, 1130.

9. 72 Stat. 951.

10. 5 U.S.C.A. § 1037(c).

11. 99 U.S.App.D.C. 199, 203–204, 239 F.2d 19, 23–24 (1956), certiorari denied, 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665 (1957).

Mr. Marvin J. Sonosky, Washington, D. C., with whom Mr. John S. White, Washington, D. C., was on the brief, for appellant.

Mr. Hugh Nugent, Atty., Dept. of Justice, of the bar of the Supreme Court of Missouri, pro hac vice, by special leave of court, with whom Messrs. Roger P. Marquis and Thomas L. McKevitt, Attys., Dept. of Justice, were on the brief, for appellee. Mr. S. Billingsley Hill, Atty., Dept. of Justice, also entered an appearance for appellee.

Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Our appellant (called "Calco" in this litigation) is the lessee of the United States in four oil and gas leases.[1] It pays royalties to the United States on the gas

---

1. Actually Calco operates the leases under agreements with the nominal lessees. It is treated as the lessee and is so called with sufficient accuracy for the purposes of this litigation.

and oil thus obtained. The controversy concerns the amount of the royalties payable.

The lands covered by the leases are in the Romere Pass field in Louisiana. The gas produced from this field is from a number of separate and independent horizons and is not all of the same nature or quality. Some horizons produce dry gas alone, some oil, and some gas associated with oil and gas distillate. The gas as it comes from the wells therefore varies in water content, pressure, and liquid hydrocarbons.

In 1951 Calco executed a contract with Southern Natural Gas Company for the sale of gas from Romere Pass and eight other fields. The price fixed was 12 cents per thousand cubic feet (mcf), with flexible provisions not here material. The contract was for gas produced in its natural state from the wells but suitable for pipe-line transmission. The contract specified maximum water content and liquefiable hydrocarbons. Some of the gas actually produced in its natural state contained these substances in excess of the maxima. Therefore it was necessary to remove these excesses in order to put the gas in a condition suitable for pipe-line transmission. The contract also provided that gas should be delivered at pipe-line pressure, the maximum of which was specified. Some 30 per cent of the gas came from the wells at less than pipe-line pressure. It was compressed to the required pressure. The expenditures to make the gas suitable for pipe-line transmission were stated to be 5.05 cents per mcf.[2]

The Secretary of the Interior billed Calco for royalties based upon 12 cents per mcf for all the gas sold. Calco claimed, and claims, it is liable upon the basis of 12 cents less so much of the 5.05-cent expenditures as were actually incurred.

Or, to state it another way, as it is sometimes stated in the litigation, Calco claims it is not liable to pay royalties on the costs of conditioning the gas.

The Secretary's authority to bill Calco for royalties on this gas and the standards to be applied in fixing such billings derive from the Mineral Leasing Act, regulations of the Department of the Interior, and the leases involved in the suit. The pertinent statute provides in part: [3]

"[L]eases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease."

The key words here are "amount or value of the production removed or sold".

The statute gives the Secretary authority to prescribe rules "and to do any and all things necessary to carry out and accomplish the purposes of" certain sections of the statute, including the above-quoted section.[4] The Departmental "Regulations Relating to Public Lands" provide:

"(d) The Secretary of the Interior may establish reasonable values for purposes of computing royalty on any or all * * * gas, * * due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. * * *."[5]

The Department's "Oil and Gas Operating Regulations" provide:

"§ 221.47 *Value basis for computing royalties.* The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due con-

2. The major part of this cost (4.5 cents) was attributable to compression, and so this portion of the cost is factually the major subject of the dispute.

3. Sec. 17, Mineral Leasing Act as amended, 41 Stat. 443 (1920), as amended, 60 Stat. 951 (1946), 30 U.S.C.A. § 226(c).

4. Sec. 32 of the Act, 41 Stat. 450 (1920), 30 U.S.C.A. § 189.

5. 43 C.F.R. § 192.82(5) (d) (1954).

sideration being given to the [factors listed in 43 C.F.R. § 192.82(5) (d), quoted above]. Under no circumstances shall the value of production * * * be deemed to be less than the gross proceeds accruing to the lessee from the sale [of the product] * * *." [6]

The leases involved in this lawsuit provide:

"Sec. 2. * * * the lessee hereby agrees:

* * * * * *

"(d) *Rentals and royalties.*—(1) To pay the rentals and royalties set out in the rental and royalty schedule attached hereto and made a part hereof.[7]

"(2) It is expressly agreed that the Secretary of the Interior may establish reasonable minimum values for purposes of computing royalty on any or all * * * gas * * *; due consideration being given to the [factors listed in the regulations from which we have quoted above]."

There is no question as to the Secretary's authority to require the payment of 12½ per cent royalty on the "value of the production". The statute so provides. The parties agree that "value" means fair market value. The heart of this part of the controversy is the meaning of "production". Does it mean the raw product as it comes from the well, no matter what its condition? Or does it mean that product readied for the market in and to which it is being sold?

Let us here insert a cautionary parenthesis. No transportation costs are involved in this case. The Secretary is not here claiming that costs incurred in moving gas from the field in the neighborhood of the wells to a distant selling point are includable in the royalty base. This gas was conditioned by the seller and delivered to the purchaser in the field within a short distance of the wells. There were no transportation costs. The Kettleman Hills case [8] was concerned with an element of comparative transportation costs in the determination of market value. The Sartor case [9] is cited to us, but that case involved a private lease and the question was whether summary judgment was proper upon the evidence there presented as to the "rate of market price". There was a market at the wellhead, and the question was the amount of that price. Neither of these two cases helps us in our present problem. Neither are manufacturing costs involved here. The product was not transformed by a manufacturing process.

Appellant admits that it has a duty to market the gas removed from these leaseholds. This duty is clearly spelled out in the Secretary's regulations: [10]

"§ 221.35 *Waste prevention; beneficial use.* The lessee is obligated to prevent the waste of oil or gas and to avoid physical waste of gas the lessee shall consume it beneficially or market it or return it to the productive formation."

The premise for the Secretary's decision in the case before us was that, since the lessee was obliged to market the product, he was obligated to put it in marketable condition; and that the "production" was the product in marketable condition.[11] Theoretically, any gas—any "production"—is "marketable". We can assume that, if the price were low enough to justify capital expenditures for conditioning equipment, someone would undertake to buy low pressure gas having a high water and hydrocarbon content. A lessee who sold unconditioned gas at such a price would, in a rhetorical sense,

---

6.  30 C.F.R. § 221.47 (1959).

7.  Schedule "A", *Rentals and Royalties*, provided:
    "*Royalty on production.*—To pay the lessor 12½ percent royalty on the production removed or sold from the leased lands."

8.  Continental Oil Co. v. United States, 184 F.2d 802 (9 Cir.1950).

9.  Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

10.  30 C.F.R. § 221.35 (1959).

11.  See The Texas Co., 64 I.D. 76, 78 (1957).

be fulfilling his obligation to "market" the gas, and by thus saving on overhead he might find such business profitable. There is a clear difference between "marketing" and merely selling. For the former there must be a market, an established demand for an identified product. We suppose almost anything can be sold, if the price is no consideration. In the record before us there is no evidence of a market for the gas in the condition it comes from the wells. The only market, as far as this record shows, was for this gas at certain pressure and certain minimum water and hydrocarbon content.

The purpose of the Mineral Leasing Act was not to obtain sales for the gas from these reserves on Government land at any price. The Act was intended to promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that "belong" to the public. The Secretary of the Interior is the statutory guardian of this public interest.[12] He has a responsibility to insure that these resources are not physically wasted and that their extraction accords with prudent principles of conservation. To protect the public's royalty interest he may determine that minerals are being sold at less than reasonable value. Under existing regulations he can restrict a lessee's production to an amount commensurate with market demand, and thus protect the public's royalty interest by preventing depression of the market. He may also establish "reasonable values" for royalty purposes. Of course his duties have another aspect. The public does not benefit from resources that remain undeveloped, and the Secretary must administer the Act so as to provide some incentive for development. He has statutory power to prescribe regulations to effectuate the purposes of the Act.

An administrative official charged with the duty of administering a specific statute has a duty to determine as an initial and administrative matter the meanings of terms in that statute. Under familiar principles of administrative law a reviewing court has a limited function "where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially".[13] The Secretary of the Interior, responsible for administering the Mineral Leasing Act, has defined the statutory term "production" to mean gas conditioned for market. It seems to us that, in view of the purposes of the statute and his various responsibilities in respect to gas from public lands, his definition is a reasonable one and the court should not reject it. We are of opinion that the Secretary has authority to define for administrative purposes the "production" to be valued, and we are unable to find that he has abused his discretion in this case.

Some argument was made concerning prior administrative practice, but no evidence was presented to the District Court to show prior inconsistency. The Secretary vehemently declares a long-time consistent practice. In the absence of evidence one way or the other, argument on the point is of no value.

Appellant has made no showing that the Secretary's definition of production would deprive it of all profit or make successful operation of the lease impossible.[14]

Affirmed.

---

12. Knight v. United States Land Association, 142 U.S. 161, 181, 12 S.Ct. 258, 35 L.Ed. 974 (1891).

13. N. L. R. B. v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

14. Section 2(d) (4) of the lease provides: "Royalties shall be subject to reduction on the entire leasehold or on any portion thereof segregated for royalty purposes if the Secretary of the Interior finds that the lease cannot be successfully operated upon the royalties fixed herein, or that such action will encourage the greatest ultimate recovery of oil or gas or promote conservation."

There is no indication that Calco attempted to secure relief under this clause.