**UNITED STATES of America,
Appellant,**

v.

**SOUTHWEST POTASH CORPORATION
and American Surety Company of
New York, Appellees.**

**No. 7945.**

United States Court of Appeals
Tenth Circuit.

Oct. 15, 1965.

Roger P. Marquis, Atty., Dept. of Justice (J. Edwards Williams, Acting Asst. Atty. Gen., and John F. Quinn, Jr., U. S. Atty., with him on brief), for appellant.

William E. Willis, New York City (Iden & Johnson, Albuquerque, N. M., Sullivan & Cromwell and Anthony Chandler, New York City, with him on brief), for appellees.

Before MURRAH, Chief Judge, SETH, Circuit Judge, and TEMPLAR, District Judge.

MURRAH, Chief Judge.

This suit involves the interpretation of the royalty provisions of Department of Interior leases for the mining and production of potash deposits on public lands in New Mexico. The United States appeals from a summary judgment for the lessee-appellee construing the pertinent provisions contrary to the administrative construction and application. These leases were issued pursuant to the so-called Potassium Act of February 7, 1927, 44 Stat. 1057, 30 U.S.C. § 282, and in accordance with the statute provided for a royalty of $3\frac{1}{2}$ percent of the gross value of the "output of the lease deposits * * * at the point of shipment to market.".[1] Such royalty was to be "paid monthly in cash or delivered in kind at the option of the lessor." In accordance with pertinent regulations,[2] it was "expressly agreed that the Secretary of the Interior may establish reasonable minimum values for the purpose of computing royalty on any of the lease deposits, due consideration being given to the highest price paid for a part or majority of the production of like quality products from the same general area, the posted price and other relevant matters."

1. Sec. 2 of the Act provides in material part for the payment of "a royalty of not less than 2 per centum of the quantity or gross value of the output of potassium compounds * * * at the point of shipment to market * * *."

2. 30 C.F.R. § 231.27, p. 258, "*Sale price basis not less than highest market price; Secretary of the Interior may determine and declare market price.* The sale price basis for the determination of the rates and amount of royalty shall not be less than the highest and best obtainable market price of the ore and mineral products, at the usual and customary place of disposing of them at the time of sale, and the right is reserved to the Secretary of the Interior to determine and declare such market price, if it is deemed necessary by him to do so for the protection of the interests of the lessor."

In the mining operations under the leases the appellee, like other lessees in this area, crushed the ore at or near the face of the mine and hoisted it to the surface where it was treated and refined to produce potassium and potash commercial products. These products were then sold f. o. b. at or near the mine site at posted prices ranging from about $35 per ton for potassium sulphate, $21 per ton for muriate of potash, and $3.50 per ton for finely crushed, but unrefined, ore, commonly called manure salts. The prices varied in accordance with the grade or degree of fineness of the product, and royalty was paid and accepted on the gross value of the particular product produced and sold by the lessee.

The National Potash Company, another lessee in the same area, needed Southwest's high grade ore to blend with and upgrade its low grade ore in the refining processes. Southwest contracted with National to sell it about five million tons of high grade crude ore, to be delivered over a five-year period, for $2.75 per ton f. o. b. The ore was to be produced and sold under the contract in connection with appellee's other regular mining operations and commitments. Unlike manure salts, it was delivered exactly as it came from the mine as crude potash ore. It is admittedly a unique transaction in the industry in this area, but no one questions the bona fides of the transaction.

Prior to the consummation of the contract, Southwest informed the Regional Mining Supervisor in New Mexico of the proposed contract, stating in detail the underlying economic reasons for the sale, and suggesting that though the government's royalty would be less because of the sales price, it would be ultimately advantageous and in the interest of conservation. The Regional Supervisor made no objection to the consummation of the contract, but insisted that the royalty from the contracted ore "must be computed and paid by Southwest on the same basis as if the ore were refined and products obtained therefrom marketed by Southwest". The reasons for the Supervisor's position were (1) that the ac-

ceptance of the royalty on the basis of the contract price of the ore would amount to a reduction in the royalty income as compared to the royalty on the value of the products then being produced and sold by the lessee; and (2) that it would be discriminatory against other lessees then producing and selling other highpriced products. The Supervisor pointed out that to his knowledge, there had never been a similar situation in the Carlsbad area; and that the sale could not be construed as a sale of manure salts since National did actually market refined products from the ore.

On appeal the Secretary of Interior affirmed the Regional Supervisor, concluding that the Department was "entitled to maintain its royalty position," that is, to require that its royalty return not be diminished as a result of such disposal. The Secretary was moreover of the view that to acquiesce in this "noncustomary" disposition of the ore would amount "in effect to a modification of the lease terms contrary to the interest of the United States." Thereafter the Regional Supervisor informed Southwest that pursuant to the decision of the Secretary the royalty due the United States on the crude ore tonnage sold to National would be computed on the basis of the mean average of the gross value of the refined products of like ore actually sold by Southwest for the current month.

After agreeing with National that if the Secretary's position were finally sustained, the parties would bear equally the added royalty burden, appellee proceeded to perform its contract with National. At first it paid, under protest, monthly royalties computed on the basis of the value of the refined product of the ore. Later, it accounted for the royalties only on the basis of the contract price.

The government filed this suit to recover the difference between the royalties computed on the basis of the refined products of the ore and the contract price. The lessee moved for summary judgment on the basis of answers to interrogatories and affidavits. The government first opposed summary judg-

ment, but after amending its complaint to recover the royalties to the date of judgment and for cancellation of the lease for breach of its terms, itself moved for summary judgment. Inasmuch as the decision of the Secretary and of the trial court turned on construction of the lease contract, the case was ripe for summary judgment.

The trial court's summary judgment for the lessee is premised squarely on full recognition of the Secretary's undoubted power and authority to administratively construe the lease contract in consonance with underlying statutes and regulations and of his wide discretion under the lease to establish reasonable minimum values for the purpose of computing royalty on any of the "lease products" after giving due consideration to the highest price paid for the production of like quality products from the same area. The court was of the view, however, that in the exercise of this broad discretion, the Secretary was confined to the establishment of minimum values on lease products actually produced and sold, and that he was "plainly wrong" in his interpretation of the contract and underlying regulations requiring the lessee to pay royalty on the basis of the reasonable value of refined products it did not actually produce and sell. In arriving at this decision the trial court was impressed by that portion of the lease agreement which provides for royalty in cash or in kind, at the option of the lessor, and reasoned that if the Secretary had elected to take its royalty in kind, he could not have required the lessee to refine and process it for purposes of computing royalty. The court was also influenced by a prior ruling of the Geological Survey affirmed by the Secretary involving similar royalty provisions of another potassium lease in which the "value of leasehold production for purposes of royalty determination is its value, regardless of physical or chemical form, at the point where the custody of the product is surrendered by the lessee." The court did not undertake to determine the minimum value of the ore actually produced and sold to National,

leaving that to the discretion of the Secretary under applicable regulations.

■ We start with the proposition about which there is no dispute, namely that the Secretary's construction of the lease contract in the light of the applicable statute and implementing regulations is entitled to great respect. Indeed, if the Secretary's interpretation is an "admissible one", we are bound to honor it, even though we would have initially entertained a different view of it. See Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, and cases cited. If, therefore, the statutory words of the lease contract, "gross value of the output of potassium compounds * * * at point of shipment to market" can reasonably be construed to mean only a treated product suitable for sale in an established market, we must accept this construction of the lease even though the Secretary may have otherwise defined the same or similar language at some other time in some other context.

In this posture we would have no occasion to consider whether the Secretary has properly exercised his unquestioned power to establish "reasonable minimum values for purposes of computing royalty on the lease deposits", or in the words of the regulations to determine "the highest and best obtainable market price of the ore and mineral products at the usual or customary place of disposing of them at the time of sale * * *." But, we consider of course the implementing lease language and regulations insofar as it gives substance and meaning to the key statutory words "output of potassium compounds * * * at the point of shipment to market". The lease, which necessarily reads upon the statute, speaks of "the output of the leased deposits at the point of shipment to market", but the import of the language used is the same.

While the Secretary did not specifically construe these critical words of the lease or their statutory progenitor, he has emphatically taken the position that he is entitled to royalty on the basis of the value of the refined product of the ore regardless of the contract sale price; and

that the acceptance of royalty on any other basis would amount to a modification of the terms of the lease. From this it seems fair to say that the Secretary has, impliedly at least, construed the critical words "output of the leased deposits at the point of shipment to market" to mean the gross value of the product of the lease deposits as customarily sold in this area in an established market.

The Secretary relies upon three cases involving value determinations under similar royalty provisions in Departmental leases as pointing the way, not only to the narrow scope of our review, but to the permissible interpretation of the critical words of the lease as well.

The first of these cases is United States v. Ohio Oil Co., 10 Cir., 163 F.2d 633. In that case the Secretary was, by the terms of the lease, authorized "to determine the reasonable minimum value of royalty oil" based upon "the highest price per barrel offered * * * at the time of production in a fair and open market for like quality oil * * * produced and sold from the field where the leased lands are situated." The lessee sold the oil under a bona fide contract with a pipeline company for 77¢ per barrel. The Secretary determined the minimum value of the oil to be the posted price, or $1.02. The record showed that oil of inferior grade and quality produced in the same field and transported to the same market under similar conditions sold for $1.02. There was nothing to justify the price differential except the contract was entered into for the purpose of inducing the purchaser to construct a pipeline to the field in order to afford a market. We reversed the trial court and sustained the power and authority of the Secretary to determine the minimum values as within the discretion committed to him by the terms of the lease.

In Continental Oil Co. v. United States, 184 F.2d 802, the Ninth Circuit was concerned with the royalty provisions of a Departmental oil and gas lease, which also authorized the Secretary to determine the minimum values of the royalty oil. The Secretary determined that the posted price of crude oil in the particular field was "unreasonably low, and not in accord with true values." He accordingly established minimum values for the royalty oil. The trial court sustained the Secretary and the Court of Appeals affirmed. The Court of Appeals observed that the contract provisions authorizing the Secretary to fix the minimum values of the royalty oil were drastic, but sustained the Secretary's determination based upon evidence of the true market value of the oil.

The other case, California Co. v. Udall, 111 U.S.App.D.C. 262, 296 F.2d 384, also involved the royalty provisions of a Departmental oil and gas lease in which the Secretary, exercising discretion committed to him, defined "value of production" in the lease to mean "marketable production", it being necessary for the producer of the gas to condition it for market. The lessor-producer sought to deduct the cost of conditioning from the sale price. Judge Prettyman, dealing with the key word "market" or "marketability" perceived "a clear difference between 'marketing' and merely selling. For the former there must be a market, an established demand for an identified product." He emphasized both the power and the duty of the Secretary to administer the statute, and so to determine as an "administrative matter" the meaning of terms in that statute. The District of Columbia Court concluded that the Secretary had not abused his discretion in defining for administrative purposes the statutory word "production".

While these cases are distinguishable, they do serve to indicate the wide range of the administrative power to interpret the statute and the lease provisions in a manner which, in the Secretary's judgment, seems to best serve the public interest. By analogy, it does not seem more drastic to construe the phrase "output of the leased deposits" to mean "refined products suitable for an established market" than to construe "value of pro-

duction" to mean "marketable production" in the context of the two cases.

This transaction is unlike a sale of manure salts which commands its own established market and does not compete in the market as a constituent part of refined products as does this crude ore.

■ Given the range of discretion committed to the Secretary, we are unable to say that the administrative construction accorded the lease is not an admissible one, and it therefore must be upheld.

There does not seem to be any controversy here concerning the Secretary's formula for determining the gross value of the ore as a refined product. In any event the matter is open on remand for the Secretary's determination in the first instance.

■ We do not think the lessee's failure to pay the royalties in accordance with the Secretary's demand based upon his construction of the contract should work a forfeiture of the lease. The disagreement served to invoke the judicatory process open to both parties in the most expeditious way provided by established rules of procedure. See Rush v. Kirk, 10 Cir., 127 F.2d 368.

The case is reversed and remanded with directions to proceed accordingly.

SETH, Circuit Judge (concurring specially).

It is demonstrated in the foregoing opinion that the applicable statute and the lease provisions, together with the practice over the years, dictate that the royalty is computed on the processed product value at shipment to market. Use of such a value is somewhat unusual in a mining lease, and leads to the problem before us.

The lease and the statute contemplate no alternative products for royalty purposes and no other market. Thus when the ore is severed it may be said that an accountability for royalty then attaches, and is not avoided by the diversion of the severed product prior to processing and marketing as was done in the case at bar.

The use of the historical market for "manure salts" is consistent with this view because there exists an established market for this material which is used for royalty value when the severed product is there disposed of.

In any event, the lease here concerned in Section 2(d) provided that the Secretary was empowered to establish reasonable minimum values for royalty computation. He was empowered by regulation to determine the best market price at the customary place of disposing of the products of the lease. This he did, although not by any means in the clearest manner.

The product of the lease was the ore, the customary market place for these products which started on the refined product route was in the refined product market. The value of the diverted ore in question was determined by its mineral content valued in this customary market using unit values and average results. The formula adopted was a reasonable one based on appellants' accountability for royalty on the severed product which matured into a liability for royalty when the product was sold as was done here. This formula is described in the letter of the Regional Mining Supervisor dated December 2, 1959, and it fairly determines the value or market price of the severed product.

There is no basis in the record or in law for a forfeiture of the lease as demanded by appellee. There was no more than an honest disagreement in construction of the lease terms as applied to an unusual but entirely good faith disposition of ore. Resort to the courts and administrative procedures should not be discouraged by demands of this nature.

I concur in the reversal and remand of this case.