**STANDARD OIL COMPANY OF CALIFORNIA, Plaintiff,**

v.

**Walter J. HICKEL, the Secretary of the Interior of the United States, Boyd L. Rasmussen, Director of the Bureau of Land Management of the United States Department of Interior, Burton W. Silcock, State Director for Alaska of the Bureau of Land Management of the United States Department of Interior, T. G. Bingham, Manager of the Land Office of the Bureau of Land Management, United States Department of Interior, Anchorage, Aalska, Defendants.**

Civ. No. A–159–69.

United States District Court,
D. Alaska.

Oct. 2, 1970.

Robert W. Vater, Delaney, Wiles, Moore, Hayes & Reitman, Inc., Anchorage, Alaska, for plaintiff.

Douglas B. Baily, U. S. Atty., Anchorage, Alaska, for defendants.

## OPINION

PLUMMER, Chief Judge.

Plaintiff, Standard Oil Company of California, petitions for review of the Secretary of Interior's decision increasing rentals on certain oil leases from 50 cents per acre to $1 per acre and for a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201, 2202 (1959). Plaintiff has exhausted its remedies under the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706 (1967).

Plaintiff is the owner of an undivided half interest in five federal oil and gas leases which were approved by the Bureau of Land Management effective September 1, 1958. Actual discovery was made on four of the leases in issue, and "constructive discovery," for purposes of extending the lease term, is attributable to the fifth by reason of its inclusion in a producing unit.

Section 1 of the lease agreements expressly makes the terms of the lease subject to any unit agreement subsequently approved by the Secretary.

The lease agreements contain standard rental and royalty provisions as follows:

"[Section 2]

(d) *Rentals and Royalties.*—(1) To pay rentals and royalties in amount or value of production removed or sold from the leased lands as follows:

*Rentals.*—To pay the lessor in advance an annual rental at the following rates:

(a) If the lands are wholly outside the known geologic structure of a producing oil or gas field:

(i) For the first lease year, a rental of 50 cents per acre or fraction thereof, or if the lands are in Alaska, 25 cents per acre or fraction thereof.

(ii) For the second and third lease years, no rental.

(iii) For the fourth and fifth years, 25 cents per acre or fraction thereof.

(iv) For the sixth and each succeeding year, 50 cents per acre or fraction thereof, or if the lands are in Alaska, 25 cents per acre or fraction thereof.[1]

(b) If the lands are wholly or partly within the known geologic structure of a producing oil or gas field:

(i) Beginning with the first lease year after 30 days notice that all or part of the land is included in such a structure and for each year thereafter, prior to a discovery of oil or gas on the lands leased, $1 per acre or fraction thereof.

(ii) If this lease is committed to an approved cooperative or unit plan which includes a well capable of producing oil or gas and contains a general provision for allocation of production, the rental prescribed for the respective lease years in subparagraph (a) of this section shall apply to the acreage not within a participating area, except that the

---

1. The parties agree that since the leases were issued pursuant to offers which were pending on July 3, 1958, they are subject to the provisions of the Act of July 3, 1958, Pub.L. No. 85–505, § 10, 72 Stat. 324, which changed the rental rate for the sixth and succeeding years for Alaska leases to conform to the 50 cents per acre rate applicable to the rest of the States.

rental for the second and third lease years for such acreage shall be 25 cents per acre or fraction thereof.

*Minimum Royalty.*—Commencing on the lease year beginning on or after a discovery on the leased land, to pay the lessor in lieu of rental, a minimum royalty of $1 per acre or fraction thereof at the expiration of each lease year, or the difference between the actual royalty paid during the year if less than $1 per acre and the prescribed minimum royalty of $1 per acre, provided that if this lease is unitized, the minimum royalty shall be payable only on the participating acreage and rental shall be payable on the nonparticipating acreage as provided in subparagraph (b) (ii) above."

On December 18, 1959 the five leases were committed in their entirety to the "Soldotna Creek Unit Area." Section 2 of the unit agreement contains the following language:

"The unit area specified in Exhibit A shall when practicable be expanded to include therein any additional tract or tracts regarded as reasonably necessary or advisable for the purposes of this agreement, or shall be contracted to exclude lands not within any participating area whenever such expansion or contraction is necessary or advisable to conform with the purposes of this agreement."

Pursuant to the unit agreement, portions of each of the leases were automatically eliminated from the Soldotna Creek Unit on January 2, 1967. The eliminated acreage lies partially over the Swanson River—Soldotna Creek Field—a "known geologic structure" of a producing oil and gas field. On May 26, 1967 plaintiff was given 30 days' notice by the Bureau of Land Management's Chief Minerals Adjudicator that rental and royalty payments would be charged according to the following schedule:

Participating unit acreage—minimum royalty

Nonparticipating unit acreage—50 cents per acre

Acreage outside the unit and partially within a known geologic structure—$1 per acre

The rental for the third category, which is the basis of this dispute, was calculated with reference to Section 2(d) (1) (b) (i) of the rental agreement, quoted above, and the case of *Continental Oil Co.* (Department of Int., B.L.M. Off. of Appeals and Hearings, July 22, 1964). Standard Oil maintains that contraction of the unit did not change the "nonparticipating" status of the lands in question because portions of the underlying lease remained committed to the unit.

The Chief's decision was affirmed by the Office of Appeals and Hearings, *Standard Oil Co.* (Department of Int., B.L.M., Off. of Appeals and Hearings, Feb. 23, 1968), and the Secretary of the Interior, *Standard Oil Co.*, 76 I.D. 271 (1969).

Plaintiff has paid the increased rentals under protest and now prays that the decision of the Bureau of Land Management be declared erroneous; that the court judicially construe the lease to require a rental payment of 50 cents per acre on the disputed acreage; and that all payments made under protest be refunded. Both parties have moved for summary judgment pursuant to Rule 56 (b) of the Federal Rules of Civil Procedure.

The sole issue presented for decision is whether the contraction of a production unit pursuant to the terms of a valid unit agreement operates to segregate, for rental purposes, excluded portions of a federal oil and gas lease which was previously committed to the unit *in toto*.

■ There is no disputed issue of fact, and inasmuch as the decision of the Secretary turned on construction of the lease contract, the case is appropriate for summary judgment. United States v. Southwest Potash Corp., 352 F.2d 113, 116 (10th Cir. 1965).

The federal rental and royalty schedule is best understood in the context of oil industry production and conservation practices.

One of the primary objectives of all oil and gas leasing, and particularly leases involving federal lands, is the conservation of resources through unitization agreements designed to preserve the natural lifting pressure of oil bearing formations by limiting the number of wells which may be sunk to any one pool or "known geologic structure." To encourage unitization all federal leases contain provisions which, *inter alia*, exclude unitized lands from acreage quotas and apply reduced rentals to lands within the unit which are designated "nonparticipating lands." Since the unit is ultimately designed to conserve the resources of geologic structures, these leases contain provisions for automatic contraction and/or expansion of the unit as the outline of the underlying structure becomes more clearly defined through production.

A second objective of the federal oil and gas lease is, of course, to maximize revenue for the lessor. Consequently, non-productive leases which lie in the vicinity of producing structures are charged a delay rental which is higher than the basic rental or the rental charged on nonparticipating unitized lands to encourage exploration and/or participation in a producing unit by the lessee.

It is clear that non-producing leases excluded in their entirety from a contracted unit are subject to a delay rental of $1 per acre if they lie over a known geologic structure of a producing field. The difficulty arises from an ambiguity in the lease provisions which exempt land from the delay rental provisions if the "lease" is committed to a unit. The draftsmen apparently did not anticipate the present situation in which contraction excludes only portions of a lease. Defendants contend that the only way in which this omission can be resolved consistently within the framework of federal leasing policies is to construe the word "lease" in the disputed provisions to mean "lands", so that subparagraph (b) (i) would apply to "lands" not committed to a unit plan and subparagraph (b) (ii) would apply to "lands" which are so committed.

Standard Oil, however, argues that the lease terms should be construed in the following fashion:

(1) Subparagraph (b) (i) of the leases (which provides for rental of $1 per acre on land over a known geologic structure prior to discovery) can not be applicable because there has been discovery (actual or constructive) on each of the leases, albeit on land within the unitized portion of the lease.

(2) The minimum royalty provision (also $1 per acre) is likewise inapplicable because the *leases* (or at least portions thereof) are committed to a unit and the land in question does not participate in production. (The inapplicability of this lease provision is apparently not disputed by the Secretary.)

(3) *Therefore*, subparagraph (b) (ii) of the lease (which provides rental as per paragraph (a) of the lease provisions [50 cents per acre] on nonparticipating lands where the *lease* has been committed to a unit) is the only applicable provision, as the leases (or at least parts thereof) are committed to a unit and excluded acreage is by definition "nonparticipating."

The Secretary maintains that the word "discovery," as used in the leases, is only a conclusion for the event which shifts a lease from rental to royalty status. If "discovery" is construed to mean "constructive discovery" (i. e., discovery attributable to certain land because of a discovery on related lands) then the anomalous result follows that a minimum royalty would be due on nonproducing lands. This conclusion, however, follows from the premise that exclusion by contraction works a segregation of the lease. The Department of the Interior has held that lands contracted out of a unit keep the same term as the underlying lease. Continental Oil Co., 70 I.D. 473 (1963). Given the provisions of the Government's standard form lease, there is no compelling reason for holding

that contraction should operate to segregate a lease for purposes of rental and royalty payments, but not for purposes of computing the term. The Secretary contends that ample precedent for such a segregation may be found in the current regulations which vary rental and royalty payments within a unitized lease according to whether the lands are participating or nonparticipating. Authority for the latter classifications, however, is clearly conveyed to the lessee by the terms of the lease; similar authority for segregations of the type which the Government here wishes the court to uphold is totally lacking in the lease provisions.

The administrative decision below cites two departmental decisions to buttress the Secretary's construction of the Standard Oil leases. Both decisions are distinguishable from the instant case.

In T. Jack Foster, 75 I.D. 81 (1968), the Secretary held, *inter alia*, that lease lands contracted out of a unit agreement which lie over a known geologic structure are subject to a delay rental fee of $1 per acre prior to discovery of oil on those lands, despite the fact that portions of the lease remain committed to a producing unit. While the factual situation is analogous in many respects to the present dispute, the lease provisions in *Foster* (which were drawn in 1948) referred to "lands" committed to the unit. With this one exception, the 1948 lease is the same in all material respects as the 1958 version. In other words, the lease contained the very provisions which defendants would now have the court read into the Standard Oil leases.[2]

The decision in *Continental Oil Co.,* (Department of Int., B.L.M., Off. of Appeals and Hearings, July 22, 1964) appears to be more on point. In that case, the Land Office charged Continental Oil $1 per acre delay rental fee for lands contracted out of a unit which lay over a known geologic structure. Although the contracted lands themselves did not lie over a known geologic structure, the Government successfully contended that the lease provision identical to subparagraph (b) (i) in the Standard Oil leases was applicable. The case is distinguishable, however, in that Continental Oil argued that the *minimum royalty* provision (not the nonparticipating rental provision) was applicable because, by virtue of the doctrine of constructive production, discovery on any part of the lease is discovery on the whole lease.[3] As the opinion correctly pointed out, there is no authority in either precedent or practice for such a construction.

Standard Oil's construction is not so lacking in support. Prior to 1954, the Department itself treated all lease land which did not participate in unit production as "nonparticipating" land, regardless of whether the land was within or without the unit. Standard Oil Co., 76 I.D. 271 (1969). In 1954, Section 17(b) of the Mineral Leasing Act was amended to provide that any lease committed in part to a unit plan would be segregated into separate leases as to the lands committed and the lands not committed. 30 U.S.C.A. § 226(j) (1970 Supp.) No provision was made for partial contraction of a lease previously committed *in toto* to a unit. While defendants point to this amendment as evidence of a policy to distinguish between nonparticipating unit lands and lands excluded from the unit, it is equally reasonable to construe Congressional silence in regard to subsequently contracted lands as an affirma-

2. *Foster* was overruled in an unreported District Court opinion, Foster v. Udall, Civ.No. 7611 (D.N.M., June 2, 1969). Although there were a number of issues involved in that case, the time for appeal has now passed and this court should not speculate as to the grounds for that decision. Its only value as precedent, therefore, is that it is some evidence of the administrative practice existing at the time this dispute arose. As will be noted below, however, there is also evidence that this "administrative practice" was far from uniform.

3. Presumably under Continental's interpretation royalties paid on the unitized portion of the lease would be credited to the minimum royalty on the non-unitized portions.

tion of established administrative practices. In fact, the Government admits that "from 1949 to 1966, the Geological Survey, which administers unitized leases, recognizing that a question existed and that a definitive ruling had not been made, decided on a tentative basis that nonparticipating acreage, whether unitized or not, should pay the same rental." Standard Oil Co., 76 I.D. 271 (1969).

■ The decision of an administrative agency in interpreting its own regulations[4] is ordinarily entitled to great weight, but, as the Supreme Court has noted, "It is only one input in the interpretational equation." Zuber v. Allen, 396 U.S. 168 at 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), relied upon by defendants, upheld the Secretary's interpretation of oil lease regulations. Although the opinion contains very broad language concerning the deference accorded to administrative interpretations, the Court noted that the Secretary's interpretation was a "matter of longstanding public record and discussion" (380 U.S. at 17, 85 S.Ct. at 801) and that large sums of money had been expended in reliance thereon. (380 U.S. at 16, 85 S.Ct. 792). Citing the special facts present in *Tallman*, the Supreme Court adhered to a narrow construction of that case in Zuber v. Allen, 396 U.S. 168, 194, 90 S.Ct. 314, 328 (1969).

Defendants also cite United States v. Southwest Potash Corp., 352 F.2d 113 (10th Cir. 1965) for the proposition that the Secretary has broad discretion in construing Government leases. That case, however, involved the application of a lease provision which *expressly* reserved the power in the Secretary or his agent to establish minimum values for the purpose of computing royalties.[5] Under the circumstances, the Secretary's

power was a matter of contractual right. Moreover, the concurring opinion of Circuit Judge Seth in that case makes it clear that the Secretary's interpretation was not inconsistent with established administrative practice.

■ The Government's rights and obligations as lessor of public lands are no different from those of any other lessor. United States v. General Petroleum Corp., 73 F.Supp. 225, 234 (S.D.Cal. 1946), aff'd, Continental Oil Co. v. United States, 184 F.2d 802 (9th Cir. 1950). The rules of construction applicable to Government contracts are the same rules applied to contracts between private parties. Reading Steel Casting Co. v. United States, 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907 (1925). The rule that omissions and ambiguities in a contract are construed most strongly against the party who prepared the instrument, Restatement of Contracts, § 236(d), is not vitiated by the mere fact that the federal government drafted the instrument. United States v. Pickett's Food Service, 360 F.2d 338, 342 (5th Cir. 1966); Reconstruction Finance Corp. v. Sullivan Mining Co., 230 F.2d 247, 250 (9th Cir. 1956). Any confusion caused by the failure to expressly provide for the situation in which a lease previously committed *in toto* to a unit agreement is partially eliminated by contraction must be charged to the party who drew the lease.

There is no basis in precedent, established administrative practice, or the language of the leases in question for the third category of lease land created by the Chief Minerals Adjudicator. In creating this category, the Chief Adjudicator acted arbitrarily and plaintiff is entitled to a summary judgment declaring that the correct rental for the lands in question is 50 cents per acre as provided for nonparticipating lands in the

---

4. The lease provisions were copied almost verbatim from Section 192.80 of the Secretary's regulations (now 43 CFR § 3125.1).

5. This is a common clause found in most federal leases involving royalty payments.

Indeed, a similar provision is to be found in the Standard Oil leases. The Secretary's authority under this provision is *not at issue in this case.*

lease agreement. All sums paid in excess of an amount computed at this rate are hereby ordered to be refunded to the plaintiff.