MARATHON OIL COMPANY, a
corporation, Plaintiff,

v.

Thomas S. KLEPPE, Secretary of the
Interior, et al., Defendants
(two cases).

Nos. C74–179, C74–180.

United States District Court,
D. Wyoming.

Dec. 11, 1975.

Wm. H. Brown and Claude W. Martin of Brown, Drew, Apostolos, Barton & Massey and Morris G. Gray, Casper, Wyo., for plaintiff.

John Lindskold, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

KERR, District Judge.

In these actions the plaintiff seeks to have this Court review, reverse, and set aside decisions of the Interior Board of Land Appeals, Office of Hearings and Appeals, U. S. Department of the Interior. The material facts are not in dispute. Most of the facts alleged in the Complaint in each case are admitted in the Answers or in admissions at the pretrial conference.

Both actions concern the construction of provisions relating to the counting of approved injection wells as if they were producing wells in connection with the computation of royalties under certain variable royalty rate oil and gas leases issued by the United States whereunder the royalty rate from month to month is determined by the daily average production of oil per well per day.

The applicable provisions of the unit agreement and the regulations authorize approved injection wells used for repressuring to be counted as if they were producing wells for the purpose of determining the daily average production per well per day. As the well count of producing or equivalent wells increases for a given volume of production, the daily average production per well decreases, and the variable royalty rate decreases accordingly as specified in the royalty schedule.

The locations of all repressuring wells including the 13 "outside" wells in dispute in the Oregon Basin case were duly approved by the Supervisor of the USGS in accordance with the applicable regulations. The locations, uses and functions of such repressuring wells were disclosed to and discussed with authorized representatives of the United States Geological Survey and were reported in monthly and annual reports to said agency. In the Elk Basin case all of the injection wells, including their locations, were included in plans of development filed with the USGS and approved by it. The locations of the wells in dispute were also disclosed to and discussed with authorized representatives of the USGS and were reported in monthly and annual reports to said agency.

In each case, the Interior Board of Land Appeals held that the disputed injection wells could not be included in the producing well count solely because they are located outside the boundaries of the participating areas for which they are being used as input or repressuring wells.

The injection wells in controversy serve the same functions as their counterpart injection wells located inside the participating areas involved, namely, to repressure and increase the production of oil from the participating areas being served and to reduce waste.

The parties agree that the water flooding program in the Oregon Basin field increased production from 8,700 barrels of oil per day to 32,000 barrels per day and that the 13 disputed wells significantly contributed to the increased production and increased royalty and will continue to do so. Such wells are used solely to repressure the two participating areas in that field. The parties also agree that the water flooding program in the Elk Basin field has greatly increased the production of oil, that the accelerated producing rates have resulted in higher royalty rates under the variable royalty leases and that the major part of the benefits of that program is attributable to the seven injection wells in dispute with respect to that producing field.

The parties agree that a purpose for authorizing the counting of injection wells as if they were producing wells is to encourage lessees to drill and operate as many such wells as will efficiently contribute to the increased recovery of unitized substances.

The amount in controversy in each of the two cases exceeds the sum of $10,-000, exclusive of interest and costs.

### Civil No. 74–179

*The Oregon Basin Unit*

Plaintiff is the operator of the Oregon Basin Unit, and is the owner of major interests and leases therein, including the following eleven Federal step scale and sliding scale leases in which the rate of royalty on oil allocated to such leases under the terms of the Unit Agreement depends upon the average daily production of oil per well: ("NETPA" designates North Embar-Tensleep Participating Area, and "SETPA" designates South Embar-Tensleep Participating Area).

| Federal Lease No. | Participating Area | Type of Royalty |
|---|---|---|
| CH044024B | NETPA | Sliding Scale |
| CH051689 | NETPA | Sliding Scale |
| CH044036D | NETPA | Sliding Scale |
| CH051690 | NETPA | Sliding Scale |
| CH051916 | SETPA | Sliding Scale |
| CH066527 | SETPA | Step Scale |
| CH044006B | SETPA | Sliding Scale |
| CH068353A | SETPA | Sliding Scale |
| CH044005B | SETPA | Sliding Scale |
| CH068353 | SETPA | Sliding Scale |
| CH073138 | SETPA | Step Scale |

The North and South Embar-Tensleep Participating Areas (NETPA and SETPA, respectively) were initially established with the formation of the unit effective March 1, 1948. Each participating area encompasses lands proved to be commercially productive from the producing formations. Production from the participating areas is allocated to the separate tracts therein, and to the owners of royalty, working interest, and other interests in such tracts on an acreage basis. All costs of operations, including the costs of all injection wells, are paid by the working interest owners on the same acreage basis.

In 1960, a peripheral water flooding project was commenced to repressure the producing formations of the North and South Embar-Tensleep Participating Areas in order to increase the production of oil therefrom.

As admitted herein, it was necessary to locate the water injection wells used in the water flooding operations near the water/oil contact in the producing reservoir, and thus close to the boundary of the participating area in order to realize maximum benefits from the program.

Twenty-nine water injection wells were drilled after commencement of the water flooding operations and were being used when this controversy arose in late 1969. Thirteen of these wells were located outside the boundaries of the participating areas involved. (One of the wells, the Herzog No. 1, is located immediately east of the common boundary of the Oregon Basin Unit and South Embar-Tensleep Participating Area. The undisputed evidence shows that this well was purchased by the working interest owners for use as a participating area water injection well pursuant to prior express approval of the then Regional Supervisor of the United States Geological Survey). These locations were selected to maximize production by repressuring the greatest possible reservoir areas. All of the 13 wells were drilled or procured and have been used exclusively to repressure the NETPA and SETPA.

As a result of the water flooding operations, production from the North and South Embar-Tensleep Participating Areas was increased from 8,700 barrels of oil per day in 1960 to approximately 32,000 barrels of oil per day in 1970.

The wells in dispute were fully approved as input wells in accordance with the operating regulations. Information as to the locations and operations of the wells (including the number of days operated each month, which is a factor governing countability of injection wells) was included in monthly and annual reports filed with the USGS.

Except for a delay in reporting one well, as the disputed wells were completed, they were included in the monthly well count report required to be furnished by plaintiff to the USGS in connection with the computation and payment of royalty.

The locations and operations of the disputed wells were reported to the USGS and were known by its personnel charged with the supervision of plaintiff's operations under the operating regulations. The USGS contends that its accounting personnel did not become consciously aware that injection wells outside of the participating area boundaries were actually being included in the producing well count until the practice was discovered in a post-audit procedure conducted in 1969.

In November 1969, the USGS Regional Accountant advised the plaintiff that the disputed wells could not be included in the plaintiff's producing well count. The Regional Supervisor confirmed this advice by decision of December 29, 1969, and directed the plaintiff to submit a revised well count and to pay back royalties retroactive to 1961. The plaintiff appealed to the Director of the USGS who affirmed the Supervisor's decision on September 20, 1971. Thereafter an appeal was perfected to the Interior Board of Land Appeals which affirmed the Director by its decision here under review.

Plaintiff's request for suspension of the decisions of the Regional Supervisor and of the Director was granted, and the disputed wells have been and are still being included in the plaintiff's producing well count and in the computations and payments based thereon.

### Civil No. 74–180

### The Elk Basin Unit

The plaintiff is a Working Interest Owner in the Elk Basin Unit, holding, among other leases, two leases (Billings 039112 and Wyoming 05717) committed to said Unit under which the royalty rates on oil allocated to said leases are determined by the daily average production of oil per well.

In 1967 a peripheral water flooding program was commenced to repressure the Embar and Tensleep formations in furtherance of the conservation objec-

tives of the unit agreement and to increase the production of oil therefrom.

In order to repressure the greatest possible reservoir and maximize the recovery of oil, seven of the eight injection wells used for this project were located outside the Embar-Tensleep Participating Area Boundary so that the injection would take place at or below the water/oil contact, on the flank of the structure.

The USGS was informed of and approved the locations and use for repressuring purposes of the seven disputed wells before they were drilled. Information showing such locations and details of water injection for each such well was reported in monthly and annual reports filed with the USGS.

The plaintiff included each of the disputed seven wells in its count of producing wells and paid royalties on the basis of the resulting computation of daily average production per well, and such payments were accepted without question by the USGS until the Acting Regional Supervisor determined such counting to be improper by decision dated November 3, 1971. Plaintiff's request for suspension of this decision was denied, and the disputed wells have since been excluded from plaintiff's producing well count in making its computations and royalty payments for the Embar-Tensleep Participating Area.

### Oregon Basin Provisions

The countability of wells for computing royalties under variable royalty rate federal leases in the Oregon Basin Unit is governed by Section 13 of the unit agreement. It reads in pertinent part:

"13. ROYALTIES : Royalties shall be paid at the rates specified in the respective leases upon that portion of the unitized substances produced and sold from any participating area which is allocated to each tract; provided that royalty due the United States . . . shall be computed as provided in the operating regulations and paid in value or delivered in kind as to all unitized substances on the basis of

the amounts thereof allocated to such lands as provided herein at the rates specified in the respective Federal leases . . . provided that, for leases in which the royalty rate on oil depends on the average daily oil production per well, the royalty rate in each participating area shall be determined for each such lease by the average daily production of all oil wells subject to this agreement producing from that participating area. Subject to approval of the Supervisor, in accordance with the operating regulations, all oil wells shut in for conservation purposes in each participating area, including productive oil wells with excess gas-oil ratios *and any and all wells of any character actually used for repressuring or recycling, shall be counted as producing oil wells*; and for leases in which the royalty rate on gas depends on the average daily gas production per well, the royalty rate in each participating area shall be determined for each such lease by the average daily production of gas per well subject to this agreement producing from that participating area."

Directly applicable is the phrase:

"Subject to approval of the Supervisor, in accordance with the operating regulations, all oil wells shut in for conservation purposes in each participating area, including productive oil wells with excess gas-oil ratios and any and all wells of any character actually used for repressuring or recycling, shall be counted as producing oil wells. . . . "

■ The countability of the 13 disputed wells depends upon whether the phrase:

" . . . and any and all wells of any character actually used for repressuring or recycling shall be counted as producing oil wells . . . "

authorizes injection wells serving the participating area to be counted, whether located within or without the boundaries of the participating area. Plaintiff contends that this provision of the Unit Agreement authorizes the counting of

such wells if used for repressuring whether they are located outside or inside of the participating area. The defendants contend that the words relating to the counting of repressuring wells are modified and limited by the preceding phrase "in each participating area" which last quote relates directly to oil wells shut in for conservation purposes. It is clear to this Court that injection wells which are approved by the USGS, completed and operated solely for the purpose of injecting water into the producing formation, are not "oil wells shut in for conservation purposes" and there is no logical basis for construing the quoted provision of the unit agreement to include "any and all wells of any character used for repressuring" in the same category as "all oil wells shut in for conservation purposes in each participating area."

The construction adopted by the Interior Board of Land Appeals does not take into account the purpose of repressuring programs nor the fact that injection wells to be most effective frequently must be located outside the participating area. Except for their locations being outside the participating area which they are repressuring, the disputed wells are indistinguishable from their counterpart injection wells located inside the participating area. The decision under review concedes that plaintiff's construction of the questionable language would be correct if a comma had been placed after the word "ratios" and immediately before the phrase commencing "any and all wells of any character actually used for repressuring." The words used in the phrase "any and all wells of any character actually used for repressuring" have a plain meaning. They relate only to repressuring wells and they contain no words limiting their location. They cannot be regarded as "oil wells shut in for conservation." With respect to any contention concerning the presence or absence of a comma in the sentence, this Court is persuaded by the rule stated in *Holmes v. Phenix Ins. Co.*, 98 F. 240 (8th Cir.):

"In a contract the words, and not the punctuation, are the controlling guide in its construction. Punctuation is no part of the English language. . . it 'is a most fallible guide by which to interpret a writing.' . . . 'there is still much uncertainty and arbitrariness in punctuation.' It is always subordinate to the text, and is never allowed to control its meaning. The court will take the contract by its four corners, and determine its meaning from its language, and, having ascertained from the arrangement of its words what its meaning is, will construe it accordingly, without regard to the punctuation marks, or the want of them. The sense of a contract is gathered from its words and their relation to each other, and, after that has been done, punctuation may be used to more readily point out the division in the sentences and parts of sentences. But the words control the punctuation marks, and not the punctuation marks the words."

See also 17 Am.Jur.2d, Contracts, § 279, p. 692 and 17A C.J.S. Contracts § 306, p. 159.

 The primary rule of construction in interpreting contracts is to give effect to the intention of the parties as expressed by the language they employ. 17 Am.Jur.2d, Contracts, § 244. Common sense and good faith are the leading characteristics of all construction of contracts. 17 Am.Jur.2d, Contracts, § 243. In ascertaining the intention of the parties, contracts are to be considered in light of their subject matter, nature, and purpose. The language should be construed with reference to the purpose of the contract so as to give effect to it. 17 Am.Jur.2d, Contracts, § 246.

The purpose of the Oregon Basin Unit Agreement was to achieve the maximum efficient yield of production that could be obtained without waste, as expressed in Section 16:

"16. CONSERVATION: Operations hereunder and production of unitized substances shall be conducted to provide for the most economical and efficient recovery of unitized substances to the end that maximum efficient yield may be obtained without waste as defined by or pursuant to State or Federal law or regulations, and production of unitized substances shall be limited to such production as can be put to beneficial use with adequate realization of fuel and other values."

The 13 disputed wells are contributing significantly to the accomplishment of this expressed objective. The purpose for permitting injection wells to be counted, expressly admitted by defendants, is to encourage the use of such injection wells so that the stated objective of maximum production without waste can be better obtained. To impose a limitation as to location on injection well countability is contrary to this express purpose and objective of the unit agreement. See also 30 CFR, § 221.4. Such a limitation is likewise contrary to the only common sense and reasonable meaning that can be garnered from the language used, viewed in the context of the agreement as a whole.

A second objective of the lessor under the lease and unit agreement is to maximize revenues to the lessor. It is obvious that maximizing revenues was not the purpose of the questioned provision for including repressuring wells in the well count except as that objective is realized from the increased quantities and rates of production resulting from the actual use of such injection wells.

If revenue maximization were to be achieved by limiting the countability of injection wells on some basis other than their ability to contribute to increases in the rate and quantity of production, the lessors could have insisted upon the deletion of such authorization in its entirety instead of accepting the Unit Agreement as it is written.

*Elk Basin Unit*

Section 21, entitled "Government Royalties" of the Elk Basin Unit Agreement states in pertinent part:

"Royalty due the United States on account of Federal lands subject to this agreement within the unit area shall be computed as provided in the operating regulations; provided, that for leases on which the royalty rate depends on the daily average production per well, said average production shall be determined in accordance with the operating regulations as though all the unitized lands within the participating area were a single consolidated lease;"

Section 221.49, Title 30 CFR, reads in pertinent part:

"Sec. 221.49 Royalty rates on oil; sliding- and step-scale leases (public land only).

Sliding-scale and step-scale royalties are based on the average daily production per well. The supervisor shall specify which wells on a leasehold are commercially productive, including in that category all wells, whether produced or not, for which the annual value of permissible production would be greater than the estimated reasonable annual lifting cost, but only wells which yield a commercial volume of production during at least part of the month shall be considered in ascertaining the average daily production per well. The average daily production per well for a lease is computed on the basis of a 28-, 29-, 30-, or 31-day month (as the case may be), the number of wells on the leasehold counted as producing and the gross production from the leasehold. (Tables for the computing royalty on the sliding-scale and on the step-scale basis may be obtained upon application to the supervisor.) The supervisor will determine which commercially productive wells for the purpose of computing royalty in accordance with the following rules, and in his discretion may count as producing any commercially productive well shut-in for conservation purposes:

. . . . .

(b) Wells approved by the supervisor as *input wells shall be counted as pro-*ducing wells for the entire month if so used 15 days or more during the month and shall be disregarded if so used less than 15 days during the month.*"

Section 23, entitled "Conservation," of the Elk Basin Unit Agreement provides:

"23. CONSERVATION: Operations and production of unitized substances shall be conducted so as to provide for the economical and efficient recovery of unitized substances to the end that maximum economic ultimate yield thereof may be obtained without waste as defined by or pursuant to applicable state and federal laws and regulations."

Section 221.4, Title 30 CFR, provides in pertinent part:

"The supervisor is hereby authorized to require compliance with least (sic) terms, with the regulations in this part, and all other applicable regulations, and with applicable law to the end that all operations shall conform to the best practice and shall be conducted in such manner as to protect the deposits of the leased lands and result in the maximum ultimate recovery of oil, gas, or other products with minimum waste. . . . "

The plaintiff contends that Section 221.49(b), quoted above, is an independent directive that all wells approved as input wells, without regard to whether they are inside the participating area, shall be counted as producing wells if so used for the required period of time. The Interior Board of Land Appeals rejected this contention, holding that the sentences in the unlettered introductory paragraph of the regulation prescribe which wells may be counted by the Supervisor for royalty computation purposes, the period of time over which production is to be averaged, and where the wells must be located, meaning on the leasehold, or, in the case of this unit, on the participating area, and that ensuing subparagraphs are to be referred to for the limited purpose of determining which wells "on the leasehold" have been used in a manner that qualified them to

1308

be counted as producing wells. Under this interpretation, the Board reasoned that subparagraph (b) is instructive as to the minimum period of time of use that is required in order for input wells to be counted. The decision under review relies in part upon the "organization of the regulation," and that the mere arrangement of Section 221.49 requires the conclusion that the provision regarding input wells was modified by all of the restrictions and limitations in the introductory paragraph. The decision reasons that since the introductory paragraph of Section 221.49 limited any wells which the Supervisor may count for variable royalty purposes to wells "on the leasehold" that phrase also qualifies and limits the wells under each of the following lettered subparagraphs, including subsection (b), to wells "on the leasehold."

This construction ignores the plain language and the purpose of the regulations, viewed as a whole.

■ The organization of Section 221.49 shows a clear intention to count as producing wells all wells which were approved by the Supervisor as input wells provided they are used for the period of time required during the month. The paragraph stands apart and alone and its plain words have a clear meaning. There is no logical basis for adding words to the regulation as it expresses the provision for counting input wells and to do so would be clearly erroneous. In this case, the seven injection wells in dispute admittedly contribute significantly to the objective of increasing the rate and quantity of production while minimizing waste. This objective is required by Section 23 of the unit agreement and is consistent with Section 221.4 of the regulations.

The purpose for allowing injection wells to be counted as if they are producing wells on the leasehold is to encourage their use so that the broader objectives of maximum production without waste can be better accomplished. To impose a restriction as to the location for injection wells would serve to impede the accomplishment of that purpose in a manner not required or permitted by the express language of the regulation.

A careful reading of the entire Section 221.49 discloses that in the first unlettered paragraph each sentence refers in express terms only to producing or productive wells including those shut in for conservation. In all of the following lettered paragraphs where reference is made to producing wells the qualification of being "on the leasehold" or its equivalent also appears (with the single exception of "headwells" part (e)). It is only where the regulation deals with "producing wells" that the qualification "on the leasehold" is used. It is manifestly omitted in 221.49(b). Had the Secretary of the Interior intended to limit input wells to those "located on the leasehold," it would have been simple to add those four words to subparagraph (b). Such words of limitation do not appear in paragraph (b) and this Court holds that it would be an error to add them by adjudication.

*Scope of Review*

■ These cases being actions to review administrative decision, the scope of review is fixed by the provisions of 5 U.S.C. § 706. The only parts of that section applicable to the present review consist of the introductory paragraph plus subparagraph (2) and (A) thereunder. The scope of review herein is limited to deciding those matters specified in the statute. This Court must hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious and an abuse of discretion or otherwise not in accordance with law.

In addition, this Court must accord great weight and respect to interpretations of the regulations by the IBLA.

■ The rule last cited is, however, only one input in the interpretational equation. *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). The rule has the most weight when the administrative interpretation is of longstanding, *Brennan v. Occupational Health and Safety Commission,* 491 F.2d

1340 (2d Cir. 1974), and in the case of statutory interpretation, of sufficient notoriety that the administrative views were made known to the Congress at the drafting stage. *Zuber v. Allen*, supra; *Standard Oil Company of California v. Hickel*, 317 F.Supp. 1192 (D.C.Alaska 1971), aff'd., *Standard Oil Company of California v. Morton*, 450 F.2d 493 (9th Cir. 1971). The rule is said to apply only if there are no compelling indications that the administrative decision is wrong. See *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 479 F.2d 842, 864–865 (cert. den.).

## Conclusion

This Court has concluded that in the Oregon Basin case (Civil Action C74–179) with all due deference to the decision of the Interior Board of Land Appeals, the decision is manifestly contrary to the clear language of the applicable provisions of the unit agreement and contrary to the purpose thereof. The construction or interpretation of the Interior Board of Land Appeals of the applicable part of the agreement is so plainly erroneous as to constitute agency action which is arbitrary and capricious and not in accordance with law.

In the Elk Basin case (Civil Action C74–180) the decision of the Interior Board of Land Appeals disregards the plain meaning of the language contained in 30 CFR § 221.49, is manifestly contrary to the plain words contained in subparagraph (b) thereof and is plainly erroneous, constituting an agency action and conclusion which is found by this Court to be arbitrary, capricious and otherwise not in accordance with law.

Accordingly, an order will be entered setting aside the decisions of the Interior Board of Land Appeals.