Elizabeth MILLIGAN, as personal representative for and the administratrix of the estate of Dean Keven Griffin, deceased, and on Behalf of John Matthew Brock Milligan, Appellant (Plaintiff),

v.

BIG VALLEY CORPORATION, a Wyoming corporation d/b/a Grand Targhee Ski Resort, Appellee (Defendant),

Ira Koplow (Defendant).

No. 87–59.

Supreme Court of Wyoming.

May 17, 1988.

Jeffrey A. Tennyson (argued), and Robert N. Williams, Jackson, for appellant.

Roger E. Shumate (argued), and W. Henry Combs, III of Murane & Bostwick, Casper, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellant Elizabeth Milligan, as personal representative of the estate of Dean Griffin, brought this wrongful death action against Big Valley Corporation d/b/a Grand Targhee Ski Resort, alleging negligence and willful and wanton misconduct in organizing, sponsoring and coordinating a ski race as part of the Ironman Decathlon. Summary judgment was entered in favor of appellee, predicated upon a release signed by the decedent prior to the ski race. This appeal is from the summary judgment.

Appellant raises two issues on appeal:
I. Whether the release in question violates public policy and is therefore invalid and unenforceable.

II. Whether the trial court correctly granted summary judgment to appellee in light of the allegation that appellee was guilty of willful and wanton misconduct.

We affirm.

## FACTS

The appellant's decedent, Dean Griffin, entered an Ironman Decathlon at the Grand Targhee Ski Resort in Alta, Wyoming, on April 13, 1985. Grand Targhee is solely owned and operated by Big Valley Corporation, a Wyoming corporation, doing business as Grand Targhee Ski Resort. The decathlon was sponsored and organized by several individuals for fun and not for profit; there was no advertising or financial sponsors. The decathlon consisted of several events, including swimming five pool laps, bowling one line, drinking a quart of beer, throwing darts, and both downhill and cross-country ski races.

The first event in the decathlon was the downhill ski race. The race was held early in the morning before the ski resort was opened to the public. The only skiers on the mountain at that time were those participating in the race. The race was run under extremely hard and icy snow conditions. No course was marked for the contestants; thus, they could take any way down the mountain they chose. The race was begun with a "La Mans" start, whereby the skiers removed their skis and left them at a distance up the mountain. Once the race started, the racers ran up to their skis, scattered for confusion's sake, put them on, and began the descent to the finish line. There were no speed gates, hay barriers, or safety nets used in the race. Nor were the racers required to wear safety helmets.

Prior to the race, and in consideration of being allowed to enter the downhill race portion of the decathlon, all of the downhill contestants, including Mr. Griffin, were required to sign a document entitled "General Release of Claim," which provided:

"The undersigned does hereby acknowledge that he/she _____ has under

the auspices of Targhee Resort at his free and voluntary will, and and [sic] further acknowledges that he understands and appreciates the risks and hazards as a participant of *IRONMAN DE-CATLON* [sic] and that there is a possibility of personal injury.

"In consideration of my being allowed to participate in *IRONMAN DECATLON* [sic] at Targhee Resort, Alta, Wyoming, I irrevocably and forever hereby release and discharge Targhee Resort and the other sponsors of and any and all of the employees, agents or servants and owners of Targhee Resort and the other sponsors of *IRONMAN DECATLON* [sic] officially connected with this event of and from any and all legal claims or legal liability of any kind, nature and description involving or relating to bodily injury or death suffered or sustained by me, or any property damage of mine, during my stay at Targhee Resort.

"I hereby personally assume all risks in connection with said event and I further release the aforementioned resort, its agents, and operators, including but not limited to persons not mentioned, for any harm, injury or damage which might befall me as a participant in this event including all risks connected therewith, whether foreseen or unforeseen and further save and hold harmless said resort and persons from any claim by me or my family, estate, Heirs or assigns.

"/s/ Dean Griffin       4/13/84
Participant's Signature       Date"

Prior to the race, a ski patrol member inspected and skied the run. He radioed to the top of the hill that the snow was extremely hard, icy, and fast and that there were some rough areas in the lower section of the run. The rough areas were marked with skis, and the skiers were informed of the conditions of the run at least five or six times before the race began. The skiers were also warned that the race was just for fun and that anyone taking it too seriously would be disqualified.

About ten minutes after the race began, the decedent Griffin, an experienced expert skier and a certified ski instructor at the Jackson Hole ski area, was found unconscious approximately ¾ of the way down the mountain. Mr. Griffin never regained consciousness and was pronounced dead a few hours later by the Teton County Coroner's office. No one witnessed the incident that resulted in Mr. Griffin's death. It was speculated that he lost control of his skis, fell, hit a tree or trees, and suffered fatal injuries. At least three other race participants also lost control of their skis at approximately the same place where Mr. Griffin's accident occurred.

Appellant, Elizabeth Milligan, as personal representative for and administratrix of the estate of Dean Griffin, commenced this wrongful death action on behalf of Dean Griffin's son, John Matthew B. Milligan, against appellee, alleging negligence and willful and wanton misconduct on the part of appellee in organizing, sponsoring, and coordinating the ski race competition. The district court, finding that the release signed by Dean Griffin released appellee from all liability, granted summary judgment to appellee.

## DISCUSSION

■ There is no dispute that the release in question was signed by the decedent. However, appellant argues that the exculpatory language contained in the release is invalid because it is contrary to Wyoming's public policy. Exculpatory agreements, releasing parties from negligence liability for damages or injury, are valid and enforceable in Wyoming if they do not violate public policy. *Schutkowski v. Carey*, Wyo., 725 P.2d 1057, 1059 (1986). "Generally, specific agreements absolving participants and proprietors from negligence liability during hazardous recreational activities are enforceable, subject to willful misconduct limitations." Id.

■ Exculpatory agreements, also referred to as releases, are contractual in nature. *Kelliher v. Herman*, Wyo., 701 P.2d 1157, 1159 (1985). Interpretation and construction of contractual agreements are questions of law for the court to decide. *Schutkowski v. Carey*, supra; *Amoco Production Company v. Stauffer Chemical*

*Company of Wyoming*, Wyo., 612 P.2d 463 (1980).

This court recently addressed the issue of the validity and enforceability of a release in Schutkowski v. Carey, supra. In Schutkowski, a skydiving student brought a negligence action against her instructors after being injured during her first jump. This court held that a release signed by the student prior to her injuries excused her instructors from any liability for negligence. In reaching this holding, we adopted the four-part test found in *Jones v. Dressel*, Colo., 623 P.2d 370 (1981), to determine whether this type of release is valid and enforceable. This four-part test is applicable here. Thus, we consider:

"(1) [Whether there exists] a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." Id. at 376.

■ A duty to the public exists if the nature of the business or service affects the public interest and the service performed is considered an essential service. Thus, our first inquiry is whether sponsoring, coordinating, and organizing a ski race is a business or service affecting the public interest and is considered an essential service demanding a public duty.

A release agreement affecting the public interest, giving rise to a public duty, has been described as one that

"concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of *great importance* to the public, which is often a matter of *practical necessity* for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it * * *. As a result of the *essential* nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services." (Emphasis added and footnotes omitted.) *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46, 6 A.L.R.3d 693 (1963).

Types of services thought to be subject to public regulation, and therefore demanding a public duty or considered essential, have included common carriers, hospitals and doctors, (see Tunkl, supra, in which the California court held that an agreement between a hospital and an entering patient affects the public interest), public utilities, innkeepers, public warehousemen, employers, and services involving extra-hazardous activities. *Malecha v. St. Croix Valley Skydiving Club*, Minn.App., 392 N.W.2d 727, 730 (1986). Generally, a private recreational business does not qualify as a service *demanding* a special duty to the public, nor are its services of a special, highly necessary or essential nature. *Schutkowski v. Carey*, supra 725 P.2d at 1060, citing *Jones v. Dressel*, supra 623 P.2d 370. Further, contracts relating to recreational activities do not fall within any of the categories above where the public interest is involved. *Malecha*, supra.

■ The type of "business" contemplated by the Tunkl court is not the type at issue in this case. The Tunkl court envisioned a type of business that "each member of the public, presently or potentially, may find essential to him * * *." 383 P.2d at 447. The sponsoring of an "Ironman Decathlon" can hardly be deemed of great importance to the public or essential to individual members of the public. The Ironman Decathlon can best be labeled a recreational type of activity of no great public import.

The agreement in question does not involve severe disparity of bargaining power, the third Schutkowski criteria. A disparity of bargaining power will be found when a contracting party with little or no bargaining strength has no reasonable alternative to entering the contract at the mercy of the other's negligence. For example, a member of the public contracting with a public utility, common carrier, hospital or employer often has no real choice or alternative and is, therefore, at the mercy of the other

party. Springer, Releases: An Added Measure of Protection from Liability, 39 Baylor L.Rev. 487, 493 (1987). Such is not the case here. Grand Targhee did not force Dean Griffin to ski in the race. Griffin could have chosen not to race. Skiing in the race was not a matter of practical necessity for the public, and putting on the race was not an essential service. Nor was skiing in the race the only reasonable alternative. Thus, no decisive bargaining advantage or disadvantage existed. Further, no evidence suggests that the decedent was unfairly pressured into signing the agreement or that he was deprived of an opportunity to understand its implications.

Appellant argues that the release was entered into unfairly because it contained boiler plate language prepared solely by the resort and was an adhesive contract. The argument is without merit. The mere fact that a contract is on a printed form prepared by one party and offered on a "take it or leave it" basis does not automatically establish it as an adhesive contract. *Matter of Estate of Frederick*, Wyo., 599 P.2d 550, 557 (1979); *Clinic Masters, Inc. v. District Court In and For County of El Paso*, 192 Colo. 120, 556 P.2d 473, 475 (1976). There must be a showing that the parties were greatly disparate in bargaining power and that there was no opportunity for negotiation for services which could not be obtained elsewhere. *Clinic Masters, Inc.*, supra at 476. Here no such showing was made. Indeed, the evidence is to the contrary. This was not a contract of adhesion. The release was fairly executed and satisfies the first three criteria from *Schutkowski v. Carey*, supra, for validity.

The final Schutkowski factor requires us to determine whether the release agreement evidences the parties' intent to release appellee from liability for negligent acts in clear and unambiguous language. *Schutkowski v. Carey*, supra 725 P.2d at 1060. "The parties' intentions are determined by giving effect to all of the contract language." Id. at 1061; *Sunburst Exploration, Inc. v. Jensen*, Wyo., 635 P.2d 822 (1981). We interpret the contract considering the meaning of the document as a whole. *Kost v. First National Bank of Greybull*, Wyo., 684 P.2d 819 (1984). Common sense is a basic characteristic of contract interpretation. *Schutkowski*, supra at 1062, citing *Marathon Oil Co. v. Kleppe*, 407 F.Supp. 1301 (D.Wyo.1975), aff'd 556 F.2d 982 (10th Cir.1977).

Appellant first argues that the release is ambiguous in not specifically naming appellee Big Valley Corporation in the document. An ambiguous contract is one

"capable of being understood in more ways than one. It is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis v. Wells*, Wyo., 565 P.2d 487, 490 (1977). See also *Western Utility Contractors, Inc. v. City of Casper*, Wyo., 731 P.2d 24 (1986).

The absence of the words "Big Valley Corporation" in the release does not create an ambiguity. The release states:

"I irrevocably and forever hereby release and discharge Targhee Resort and the other sponsors of and any and all of the employees, agents or servants and *owners of Targhee Resort and the other sponsors of IRONMAN DECATLON* [sic] officially connected with this event of and from any and all legal claims or legal liability of any kind, nature and description involving or relating to bodily injury or death suffered or sustained by me, or any property damage of mine, during my stay at Targhee Resort." (Emphasis added.)

The language could not be clearer. Examining the release in light of the purpose of the contract, it is clear that the parties intended to release the ski resort and all those involved in the Ironman Decathlon from liability. While Big Valley Corporation is not specifically named in the release, it is included in the words "owners of Targhee Resort and the other sponsors." Big Valley Corporation is the owner and operator of Grand Targhee Ski Resort. Grand Targhee Ski Resort and Big Valley Corporation are not separate entities; rather they are one and the same entity. The

release clearly envisioned releasing Big Valley Corporation.

Appellant also argues that the language of the release is too broad and ambiguous to release appellee, Big Valley Corporation, even if appellee had been specifically named in the document. Considering all of the language of the release in context, it is clear that the intent was to release appellee from negligence liability. The release expressly states that the signor

> "acknowledges that he understands and appreciates the risks and hazards as a participant of *IRONMAN DECATLON* [sic] and that there is a possibility of personal injury * * * [and] *irrevocably* and forever hereby *release*[s] and *discharge*[s] Targhee Resort * * * and owners of Targhee Resort and the other sponsors of *IRONMAN DECATLON* [sic] * * * *from any and all legal claims or legal liability of any kind* * * * for any harm, injury or damage * * * whether foreseen or unforeseen * * * and hold harmless said resort and persons from any claim * * *." (Emphasis added.)

█ The language focuses particular attention on the unconditional nature of the release. It specifically and repeatedly exempts appellee from any responsibility for potential "legal claims or legal liability of any kind * * * whether foreseen or unforeseen." Although the release does not contain the word "negligence," we held in *Schutkowski,* supra, that "the absence of the word 'negligence' is not fatal to an exculpatory clause * * * if the terms of the contract clearly show intent to extinguish liability." *Schutkowski,* supra 725 P.2d at 1061. It is difficult to envision any other intent of the parties than to release appellee from liability for negligence, considering the release language. If this were not the intent, there would be little purpose in the release at all.

█ Appellant's second argument is that there exists a genuine issue of material fact as to whether appellee was guilty of willful and wanton misconduct. The well-established standard of review for summary judgment appeals is:

> " 'When reviewing a summary judgment on appeal, we review the judgment in the same light as the district court, using the same information. A party moving for summary judgment has the burden of proving the nonexistence of a genuine issue of material fact. Material fact has been defined as one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. Upon examination of a summary judgment, we view the record from the vantage point most favorable to the party opposing the motion, giving him all favorable inferences which may be drawn from the facts.' " (Citations omitted.) *England v. Simmons,* Wyo., 728 P.2d 1137, 1141 (1986) (quoting from *Garner v. Hickman,* Wyo., 709 P.2d 407 (1985)). See also *Schutkowski v. Carey,* supra.

Where willful and wanton misconduct is shown, an otherwise valid release is unenforceable. *Schutkowski v. Carey,* supra.

In *Weaver v. Mitchell,* Wyo., 715 P.2d 1361, 1370 (1986), this court defined willful and wanton misconduct as follows:

> "Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another."

See also *Danculovich v. Brown,* Wyo., 593 P.2d 187, 191 (1979), wherein we said that willful and wanton misconduct was

> "that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. It is not with the intent to cause injury or damage, but it must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention."

We affirmed summary judgment because of the nonexistence of a genuine issue of

material fact regarding willful misconduct in *Bryant v. Hornbuckle*, Wyo., 728 P.2d 1132 (1986). In Bryant, a worker applied heat with a butane torch to a frozen valve on a water truck, resulting in an explosion. He brought an action against the foreman who instructed him on the use of the butane torch thawing method. The foreman produced evidence sufficient to constitute a prima facie showing that there was no genuine issue of material fact on the question of willful misconduct. This showing being unrefuted by appellant, we upheld summary judgment in favor of appellee. Id. at 1137.

██ Applying the Weaver definition to this case, Big Valley Corporation is guilty of willful and wanton misconduct only if it deliberately acted, or failed to act, in reckless disregard of the consequences or in a manner that evidenced a high degree of probability that harm would result to others. Here, upon the undisputed facts presented, it is clear that appellee did not act in utter disregard of consequences but was concerned for the safety of the participants. Appellee attempted to protect the racers from danger by inspecting the likely course, including the course where the decedent was killed, by grooming the course, by allowing the race at a time when the public would not be present on the mountain, by having someone ski the course to assess the snow conditions, and by announcing warnings regarding the conditions to all of the racers prior to the race. Appellant states that there were no safety nets or speed gates used. No marked course was set up. The racers were started in a group rather than in timed intervals, and no helmets were provided or required. True, the race was not down a marked course; thus there were no speed gates, safety nets, or timed intervals. Nothing is presented that indicates a requirement that the race must be down a marked course or timed. The participants knew that the race was not down a marked course, that it was a "La Mans" start, and that they might be disqualified if they did other than just ski down the hill for fun.

Granting all favorable inferences from these facts to appellant, they are insufficient to establish that appellee was guilty of willful and wanton misconduct. The undisputed facts show that safety was of concern to appellee and that specific steps were taken for the safety of the racers. While appellant posits an alternate conclusion, the record contains no evidence which demonstrates an extreme departure from ordinary care or reckless disregard of the consequences.

We conclude that the release is not void as a matter of public policy, that there is no genuine issue of material fact, and that appellee was entitled to judgment as a matter of law. The trial court properly granted summary judgment. Accordingly, we affirm.

THOMAS, J., files a specially concurring opinion.

THOMAS, Justice, specially concurring.

I concur in the opinion of the court in this case because the majority position in *Schutkowski v. Carey*, Wyo., 725 P.2d 1057 (1986), now is the law in Wyoming. The doctrine of stare decisis demands concurrence, but I have not receded from my position in *Schutkowski v. Carey*, supra, that a more appropriate and fair rule would require the use of the word "negligence" in an exculpatory agreement like this one.