[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
The plaintiff has brought a four count complaint against Strategy Plus Inc. as a result of injuries to his eye he claims to have sustained while playing "paint ball" at a facility operated by the defendant. Paint ball is a game where people rent out weapons that eject plastic balls filled with paint. The object of the game is to capture the opponent team's flag unscathed. If you are hit with a paint ball, you are removed from further participation in the game. During the game the plaintiff removed the goggles he was issued because foreign matter entered them. While doing so, a paint filled ball ejected by a weapon that is issued to players struck his eye.
Before entering the grounds on which the game is played, the plaintiff signed a document captioned in large type: "Rental and Waiver Agreement". Several lines are blocked out under these words for the person playing the game to fill in his or her name and address. Below that appears the "agreement." It is in small type for the most part and reads as follows:
 "I am completely aware of all the risks involved and there is the possibility of additional risk if Strategy plus equipment does not function properly. I also indemnify the lessor and Strategy plus Inc. against and shall hold both harmless from any and all claims, actions, suits, procedures, costs, expenses, damages and liabilities, including attorneys fees arising out of connected with or resulting from playing Strategy plus and/or the equipment Including without limitation, the manufacture, selection, delivery, possession, use operation of the equipment and the natural environment I nevertheless wish to assume any and all risks I hereby waive and release the lessor on behalf of my estate and all others who may play Strategy plus with me I also undertake to always play Strategy plus only in accordance with the safety instructions, rules and suggestions presented to me Knowing full well the intense physical/mental exertion required to play Strategy plus I further CT Page 11869 warrant that I have no medical problems that this increase in physical/mental exertion would cause me or others harm I have full read and understand the terms of this lease."
The revised complaint here is dated November 15, 1995. The first count sets forth a negligence claim, the second count is a claim made under § 52-572 (m) et seq. of the general statutes. The third count is made under § 35-1 of the general statutes and alleges that the defendant failed to properly register its name and as a result the plaintiff, in trying to ascertain the true identity of the defendant, incurred certain costs and expenses; there is a claim to recover those expenses and an allegation that a violation of the statute is an unfair trade practice within the meaning of § 42-110 of the general statutes. The fourth count makes a claim of breach of implied contract. The defendant has filed a motion for summary judgment attacking all the allegations of the revised complaint. The motion refers to a public nuisance count which was set forth in the original complaint but is not in the revised complaint. The motion for summary judgment relies on the "rental and waiver agreement" and argues that it is a "complete bar to the plaintiff's claim." The defendant's motion does not indicate how the rental and waiver agreement can bar the § 35-1 claim. That statute sets forth a statutory policy independent of any demand for recovery arising out of alleged injuries or the viability of any such claim. The court will consider that the motion applies to the first, second, and fourth counts only.
The standards to be applied in a motion for summary judgment are well known. If there is a genuine issue of fact a trial court cannot decide it. Here, however, there are really no disputed issues of fact but rather a legal issue is raised — the enforceability of exculpatory agreements in the context of sports activities. It is true that the plaintiff by way of affidavit does raise factual claims based on the circumstances under which he signed the agreement which he argues invalidate its operation as to him — it was not knowingly, intelligently and fairly entered into the plaintiff maintains. The defendant does not dispute the facts relied upon to support this position but rather argues that the facts alleged do not permit a finding that the agreement he entered into is not binding on the plaintiff.
As noted the first count is a straight negligence claim, and the fourth count of breach of an implied contract asserts that CT Page 11870 the defendant agreed to provide a "safe atmosphere" in which to play the game and by not providing a "safe haven" to make equipment adjustments — i.e. clear out the goggles — violated the implied agreement. For the purposes of the defense raised by the signed rental and waiver agreement, the exculpatory agreement defense would appear to apply to both of these counts. Because of the way the implied contract claim is worded if the agreement is a bar to the negligence claim it should be a bar to the implied contract claim. If it is not a bar to that negligence count it is not a bar to the implied contract count. Therefore, the court will first deal with the motion as it applies to the negligence and implied contract counts. The court will deal separately with the issue of the applicability of the alleged bar of the rental and waiver agreement to the § 52-577 (m) claim, since this defense raises other issues as to that claim.
 I.
It is generally recognized that agreements exempting owners and operations of sports facilities from liability for negligence entered into with patrons of the facility are valid and enforceable against a patron. The cases are generally collected in two articles, 8 ALR 3d 1393: "Validity, Construction, and Effect of Agreement Exempting Operator of Amusement facility from Liability for Personal Injury or Death of Patron" and 5 COA.2d 719: "Cause of Action Against Ski Area Operator for Injury or Death Occurring on Ski Slope or Ski Lift."
Whether these exculpatory agreements are defined as contracts of adhesion or not under local definitions of that term all courts seem to say that such agreements must be closely scrutinized since they are drawn up by the sport's facility and result in the surrender of an important right by a party who in fact has been injured.
(a)
Apart from the actual language of this waiver agreement and what it should be held to mean there is the preliminary question raised by the plaintiff about whether it was fairly and honestly negotiated and whether given all the circumstances surrounding its signing it should be enforced.
The general so-called duty to read rule has always been that in the absence of a claim of fraud or mutual mistake "one having CT Page 11871 the capacity to understand a written document who reads it, or without reading it or having ir read to him (sic) signs it, is bound by his (sic) signature," Rossi v. Douglas, 100 A.2d 3, 7
(Md. 1953), see also Palmquist v. Mercier et al, 272 P.2d 24, 30
(Cal. 1954); "no one could rely on a signed document if the other party could avoid the transaction by saying that he (or she) had not read or did not understand the writing"; Contracts,
Calamari Perillo, 3d edit., § 9-42, page 410. There is certainly no question concerning the capacity of this college educated plaintiff to read a written document filled with non-technical terms. As Calamari points out, however, over the years exceptions to the traditional rule at least in some jurisdictions have developed in so-called contracts of adhesion. These are contracts which are standard form, prepared by one of the parties, and not really negotiated over; a leading case isWeaver v. American Oil Co. 276 N.E.2d 144 (Ind., 1971) As Calamari points out at § 9-44, page 419 courts have held that agreements or clauses deemed unusual or unfair do not bind a party "unless the clauses are at least brought to (the party's) attention and explained. The theory is that since such clauses impose such a great hardship or risk on the weaker party, who is otherwise unable to protect himself (or herself), an informed and voluntary consent should be required." Courts accepting the contract of adhesion view as to exculpatory agreements offered as a bar to negligence claims by sports facilities or at least viewing them more critically also have taken a close look at the circumstances under which these agreements were signed — was the clause explained, was the operator willing to negotiate its terms, were the patrons given chance to even read the document and ask questions, Eder v. Lake Geneva Raceway, Inc,523 N.W.2d 429, 432 (Wis, 1994), cf Moore v, Edmonds, 52 N.E.2d 216, 223
(Ill., 1944). These courts are alert to finding that such clauses cannot be rendered in overly fine print Putzer v. VicTanney-Flatbush Inc., 248 N.Y.S.2d 836, (1964). As Putzer also notes courts with this view also hold the circumstances under which such agreements were signed and whether they were fairly and honestly bargained over cannot be decided by way of summary judgment and present a question of fact for the jury. Sexton v.South Western Auto Racing Association, 394 N.E.2d 49, 51 (Ill., 1979) Jeute v. Jarnowski, 393 F.2d 513, 514 (CA7, 1968).
Courts more favorable to exculpatory agreements regarding sports activities are more reluctant to abandon under all circumstances the duty to read rule. As said in Schlobohm v. SpaPetite, Inc, 326 N.W.2d 920, 924-25 (Minn., 1982): "Even though a CT Page 11872 contract is on a printed form and offered on a `take it or leave it' basis, those facts alone do not cause it to be an adhesion contract. There must be a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation and that the services could not be obtained elsewhere. . . In our view there was no disparity in bargaining power. Schlobohm voluntarily applied for membership in Spa Petite and acceded to the terms of the membership. " The court goes on to say:
 There was no showing that Spa Petite's services were necessary or that the services could not have been obtained elsewhere. She had an option of becoming a member in Spa Petite subject to the regulations and policies clearly set forth in the membership contract or not to do so, as she chose. It should have been obvious to anyone of Schlobohm's age, education and experience that an exercise program in a gymnasium bears with it a certain risk of injury, and that by the exculpatory clause Spa Petite indicated clearly that it was unwilling to shoulder that risk for the relatively nominal membership fee it charged its members. Nothing in the record indicates that Schlobohm had been directed to participate in Spa Petite's program by any health adviser, nor that similar facilities offering similar programs were unavailable. Even if there were a scarcity of facilities for gymnastic and reducing activities in the area, that fact alone would not create such a disparity of bargaining power. See Owen v. Vic Tanny's Enterprises, 48 Ill. App.2d 344, 348, 199 N.E.2d 280, 282 (1964). We conclude that there was absent any disparity of bargaining power under these circumstances and that the contract was not one of adhesion. . . . .
Also see Milligan v. Big Valley Corporation, 754 P.2d 1063, 1067
(Wyo., 1988).
In this case the facts and circumstances surrounding the signing of the agreement are not that favorable to the plaintiff CT Page 11873 under a Schlobohm analysis. As noted he is an educated person, the waiver agreement is printed in small but not illegible type and more importantly it is prefaced by very large lettering in bold type that says "Rental and Waiver Agreement". After the agreement, set forth earlier in this opinion, language is included advising the patron in large type to consult an attorney if the patron had any questions about signing the agreement. Also the plaintiff was under no compulsion to enter into the agreement and play the game. The fact that at the time he signed it he was rushed appears to be more a function of the fact that he and his friends were anxious to play the game as soon as possible.
In the court's view it is not a fruitful approach to analyze the enforceability or not or not of these agreements based on the particular facts and circumstances under which they were signed absent traditional claims of fraud or mutual mistake. Such an approach leaves too much to the whims of particular judges and whether or not they favor or disfavor this type of agreement without fostering the production of rules to (1) guide sports facilities in preparing exculpatory agreements, necessary if these high risk businesses are to be economically viable without being the preserve of the very rich, willing to pay high fees and (2) to protect patrons. It seems fairer to approach the problem from the perspective of these last two factors by concentrating on the actual contents of these agreements and what they should or need not tell prospective patrons.
(b)
There is a sharp disagreement in the cases over what language must be included in these agreements as a prerequisite for holding that they in fact bar a claim in negligence against the owner or operator of a sports facility. Some courts require that specific language be included alerting the patron that he or she waives any claim for injury caused by the actual negligence of the facility operator, Ciofalo v. Vic Tanney Gyms, Inc.177 N.E.2d 925, 926 (NY, 1961), Bernstein v. Seacliff Beach Club,228 N.Y.S.2d 567, 568 (1961), Hertzog v. Harrison Island Shores Inc.,
251 N.Y.S.2d 164, 165 (1964), Jones v. Walt Disney World Co.,409 F. Sup. 526, 528 (WDNY, 1976), Gross v. Sweet, 424 N.Y.S.2d 365,368 (1979), Geise v. County of Niagra, 458 N.Y.S.2d 162, 164 (NY 1983), Celli v. Sports Car Club of America, 105 Cal.Rptr. 904,911 (1973), Ferrell v. S. Nevada Off-Road Enthusiasts,195 Cal.Rptr. 90, 95 (1983), Guido v. Koopman, 2 Cal Rep 2d 437, 438 (1991), Rosen v. LTV Recreational Development, 569 F.2d 1117, CT Page 11874 1122 (CA 10, Colo, 1978), cf Schlobohm v. Spa Petite Inc.,326 N.W.2d 920, 923 (Minn. 1982). The court in Gross v. Sweet at424 N.Y.S.2d 365 referred to Ciofalo holding that the patron must be explicitly made aware the waiver covered the negligence of the operator of the facility but said "that does not mean that the word `negligence' must be employed for courts to give effect to an exculpatory agreement; however, words conveying a similar import must appear."
Other courts disagree with this view. They agree that exculpatory agreements must be strictly construed but hold that the word "negligence" need not be used; the operator of a sports facility can be protected by an agreement in which the patron releases the operator from "any claim;" Scott v. Pacific WestMountain Resort, 834 P.2d 6, 10 (Wash, 1992): "Courts should use common sense in interpreting purported releases and the language `hold harmless from all claims' logically includes negligent conduct," Milligan v. Big Valley Corporation, 754 P.2d 1063,1068 (Wyo, 1988), Douglass v. Skiing Standards Inc,.459 A.2d 97, 98 (Vt., 1983). The Illinois cases are confusing. An early case enforced an exculpatory agreement after saying it must be strictly construed against the party it favors although the agreement before it did not explicitly bar claims even though the facility was negligent but merely released the operator from "any and all claims." Confusingly the court cited the New YorkCiofalo case which specifically required an allusion in the agreement referring to operator negligence and the fact that a claim based on it was waived. A later Illinois case also recognized such agreements are strictly construed and referred with approval to the language in an exculpatory agreement specifically alluding to a wide range of risks including operator negligence. Falkner v. Hinckley Parachute Center, 533 N.E.2d 941,945 (Ill., 1989). Pennsylvania also has two cases saying "reference to operator negligence need not appear in the agreement but after all "common sense" controls and negligence has to be understood as being covered in an agreement which releases the operator from "any and all claims", Zimmer v.Mitchell and Ness, 385 A.2d 437, 439 (Pa, 1978), Weiner v. Mt.Airy Lodge, 719 F. Sup. 342, 345 (M.D.Pa. 1989), but seeKotovsky v. Ski Liberty Operating Corporation, 603 A.2d 603,666 (Pa. 1992) which upheld an exculpatory agreement against a negligence claim because "the release specifically referred to and included possible liability for acts of negligence" by the owner. CT Page 11875
The court believes that the fairer rule is expressed in theCiofalo line of cases which require the exculpatory agreement to specifically alert the patron that he or she by signing the waiver is releasing the operator of the facility from injury caused by the operator's own negligence. Cases disagreeing say an agreement releasing an operator from "any and all claims" as a matter of "common sense" include within that phrase claims which might arise out of the negligence of the operator. What may be "common sense" to judges and lawyers who are used to interpreting the ambit of legal phrases is not necessarily obvious to the nonlawyer public who by signing these agreements give up valuable rights. As succinctly stated in Gross v. Sweet, supra at 424 N.Y.S.2d page 369 where the court referred to the use of "any and all claims" language:
 Assuming that this language alerted the plaintiff to the dangers inherent in parachute jumping and that he entered into the sport with apprehension of the risks, it does not follow that he was aware, much less intended to accept any enhanced exposure to injury occasioned by the carelessness of the very persons on which he depended for his safety.
Also see Ferrell v. S. Nevada Off Road Enthusiasts, supra at 195 Cal Rptr page 93: "to be sufficient as an exculpatory provision against one's own negligence, the party seeking to rely thereon must select words or terms clearly or explicitly expressing that this was the intent of the parties."
It imposes no great burden on sports facilities engaged in high risk activities to require that their exculpatory agreements include language that explicitly states that the patron, if injured, waives any claim he or she might have against the operator of the facility even though the injury was caused by the operator's negligence. In fact all it would involve is a call to the printers to add such a phrase to the language of the waiver agreements. What is the argument against it in fact? Is it a credible or acceptable argument to say that such specificity is not required although a certain number of people who sign these things would not have done so if they had known that the operator was absolving itself from the consequences of its own negligence? Even if as a matter of "common sense" many if not most people signing an agreement releasing the operator from any and all claims would also understand that they were releasing the CT Page 11876 operator from claims engendered by its own negligence, it would also seem a matter of "common sense", as defined in real world terms, that many people would not sign an agreement explicitly releasing the operator from the consequences of its own negligence — many of these activities are high risk, people know it, why should they take this added risk. And in any event, how could many unsophisticated members of the public even evaluate the added risk that would be presented by the operator's own negligence. If including the explicit language waiving responsibility for operator negligence will discharge a discrete group of people from playing a particular high risk sport that would be an incentive for the operator to minimize the possibility of its own negligence in producing injury and would still allow the use of these agreements to keep down costs so that these types of activity are economically viable.
This position at least approaches a position set forth in a subsection of § 211 of Restatement 2d Contracts which, in a rule Calamari says was created primarily for standardized agreements, the Restatement says:
 (3) Where the other party has reason to believe that the party manifesting such assent would not do so if he (sic) knew that the writing contained a particular term, the term is not part of the agreement.
Also this net result comports with what in fact was recognized in Schlobohm v. Spa Petite Inc, supra. That case as noted took a hard line in not permitting the plaintiff to extract herself from the exculpatory agreement on a claim of unfair and dishonest negotiation but it is interesting to note that the actual agreement in that case, which the court upheld, barred suit for injury resulting from "all acts of active or passive negligence," 326 N.W.2d at page 922.
Applying these principles here the granting of summary judgment would not be appropriate. The waiver agreement made no explicit reference to the operator's negligence. It does refer to the functioning of the equipment. But there is a difference from bearing the risk that equipment under some circumstances will not function properly and accepting the further risk that it will not function because it was negligently maintained or unfit for the use to which it was to be put in particular circumstances or for use in the sport at all.[1]
CT Page 11877
2.
One of the claims made by the plaintiff is based on our Products Liability Act, § 52-572 (m) et seq. (Second Count). For the same reasons set forth previously the court will not grant summary judgment as to this count. However, it is also true that it may be inappropriate in any event to permit a defendant facing a products liability claim to avoid responsibility under such a claim based on an exculpatory agreement such as the one entered here. A strict liability claim based on defective product should arguably not be barred by use of an exculpatory agreement, cf Weiner v. Mt. Airy Lodge, 719 F. Sup. 342, 346 (M.D.Pa, 1989). Sellers or other distributors would use these devices to avoid their responsibility; "a social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller through the use of standardized disclaimers engenders little social resistance," KeystoneAeronautics Corporation v. RJ Enstrom Corporation et al,499 F.2d 146, 149 (CA3, 1974), cf Baker v. City of Seattle, 484 P.2d 405,407 (Wash, 1971).
In any event, the motion is denied as to all counts.
CORRADINO, J.